**COMMERCIAL CREDIT COUN-
SELING SERVICES, INC.,**
Appellant–Defendant

v.

**W.W. GRAINGER, INC., Lose Bros.,
Inc., and XSE Group, Inc.,**
Appellee–Plaintiff.

No. 49A02–0409–CV–792.

Court of Appeals of Indiana.

Jan. 13, 2006.

Karl L. Mulvany, Nana Quay–Smith, Julie D. Reed, Bingham McHale, LLP, Indianapolis, for Appellant.

R. Brock Jordan, Gene A. Wheeler, Rubin & Levin, P.C., Indianapolis, for Appellees.

## OPINION

ROBB, Judge.

Commercial Credit Counseling Services, Inc., (CCCS) appeals from trial court rulings in favor of W.W. Grainger, Inc. (Grainger) and XSE Group, Inc. (XSE), following a consolidated hearing on separate verified petitions for rule to show cause.[1] We affirm.

### Issues

CCCS raises four issues for review, which we consolidate, reorder, and restate as:

1. Whether the trial courts properly voided the purported transfer of security interests given to CCCS in the assets of Grainger and XSE;

2. Whether the trial courts properly voided as fraudulent to creditors the

---

1. This appeal arises from three separate cases in the Marion County Superior Court, which were consolidated for hearing purposes only. Each trial court issued its own ruling after the hearing. Lose Bros., Inc., an original party to this appeal under Cause Number 49D13– 3090–CC–1567, has since settled with CCCS. We therefore grant CCCS's motion to dismiss its appeal as against Lose Bros., Inc. We also hereby grant Amicus Curiae status to the Commercial Law League of America.

transfer of funds from Grainger and XSE to CCCS; and

3. Whether the trial courts properly held CCCS in contempt of a Continuing Order in Asset Garnishment with respect to Grainger, and of a previously issued order to answer interrogatories or appear for a hearing in proceedings supplemental in regard to XSE.

### Facts and Procedural History

On June 7, 2004, a consolidated hearing was held relative to separate proceedings supplemental in which CCCS had been named garnishee defendant. Each trial court issued findings of fact and conclusions of law on the respective verified petitions for rule to show cause before it.

### A. Grainger v. Performance Electrical Systems, Inc.

On August 11, 2003, judgment was granted in favor of Grainger against Performance Electrical Systems, Inc. (Performance), in the amount of $26,806.42 plus costs. Grainger then filed a motion for proceedings supplemental. Notice of the garnishment proceedings was mailed to CCCS on October 6, 2003, and received October 14. CCCS had been contracted by Performance to administer a restructured debt plan with Performance's creditors, including Grainger. The notice to CCCS included an order to either answer attached garnishment interrogatories on or before October 20, or appear and answer at the October 28 hearing on proceedings supplemental. CCCS filed its answers with the trial court on October 21, one day after the court-imposed deadline to do so, and did not appear at the October 28 hearing. The Continuing Order in Asset Garnishment (Garnishment Order) was issued on November 5, 2003, for an amount including interest and costs not to exceed

$27,408.94, and was served on CCCS on November 20.

On January 29, 2004, Grainger filed a Verified Petition for Rule to Show Cause and to Restrict Disbursement of Funds As To CCCS, alleging that CCCS had made no payments pursuant to the Garnishment Order, and may have come into possession of additional funds belonging to Performance, which it had or may disburse contrary to the Garnishment Order. The trial court entered an Order to Show Cause and To Restrict Disbursement of Funds. In part, this order restricted disbursement by CCCS up to $27,902.47, and required CCCS's Senior Debt Manager to appear for a hearing to explain why CCCS should not be held in contempt regarding the Garnishment Order. On March 23, 2004, this hearing was consolidated by the trial court's order with XSE's hearing, to be held June 7, 2004.

### B. XSE v. Just the Fax, Inc.

On October 6, 2003, judgment was granted in favor of XSE against Just the Fax, Inc. (Just the Fax), in the amount of $10,461.42 plus costs. Just the Fax had also previously contracted with CCCS to have a restructured debt plan administered with its creditors. On December 4, 2003, CCCS was served with an order to answer garnishment interrogatories by December 30, 2003, or to appear at the proceedings supplemental hearing on January 13, 2004. CCCS chose not to appear at the hearing, and did not respond with answers until March 12, 2004, after the trial court had issued an Order for Rule to Show Cause on February 2, 2004. The show cause hearing was consolidated with that in Grainger's action by order of the trial court on March 30, 2004, to be held June 7, 2004.

### C. Consolidated Hearing on Petitions for Rule to Show Cause

The Grainger court concluded (1) the purported transfer of a security interest in

the assets of Performance to CCCS was null and void as fraudulent; (2) the purported transfer of $9,426.51 from Performance to CCCS was null and void as fraudulent, and that CCCS must disgorge itself of the funds transferred; (3) CCCS was in contempt of the Garnishment Order, and must cleanse itself by disgorgement of the $9,426.51 received from Performance by payment to Grainger; (4) the Garnishment Order remained in effect, to be complied with by CCCS should it come into possession of additional property of Performance; and (5) if CCCS failed to disgorge the funds as ordered, the trial court would enter judgment against it for that amount, costs and interest, and any additional relief appropriate.

The XSE court similarly concluded (1) the purported transfer of a security interest in the assets of Just the Fax to CCCS was null and void as fraudulent; (2) the purported transfer of funds from Just the Fax to CCCS was null and void as fraudulent, and that CCCS must disgorge itself of the funds transferred including costs and interest totaling $11,235.36; (3) CCCS was in contempt of the order to answer interrogatories or appear for a hearing supplemental, served to CCCS on December 4, 2003, and contrary to that order, CCCS disbursed funds of Just the Fax, for which CCCS must cleanse itself by disgorgement of the $11,235.36 to XSE; and (4) if CCCS failed to disgorge the funds as ordered, the trial court would enter judgment against it for that amount, costs and interest, and any additional relief appropriate.

CCCS now appeals these rulings.

### Discussion and Decision
#### I. Standard of Review

A trial court is vested with broad discretion in conducting proceedings supplemental, which are summary in nature.

*Gallant Ins. Co. v. Oswalt,* 762 N.E.2d 1254, 1257 (Ind.Ct.App.2002), *trans. denied.* Specific findings made by a trial court, such as in the cases at hand, are an anomaly because issuance of findings in a judgment rendered in proceedings supplemental is disfavored in Indiana. *First Bank of Whiting v. Samocki Bros. Trucking Co.,* 509 N.E.2d 187, 189 n. 1 (Ind.Ct. App.1987), *trans. denied.* For this reason, we treat the trial courts' findings as general findings in favor of Grainger and XSE, and we consider the findings as far as they supply the trial courts' legal reasoning for rendering their judgments. *Id.*

When reviewing a summary judgment, our well-settled standard of review is whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Gallant,* 762 N.E.2d at 1257. A trial court's ruling on a motion for summary judgment is clothed with a presumption of correctness, and we will affirm on any theory supported by the record. *Id.*

#### II. CCCS's Secured Interests

The parties do not dispute that a judgment creditor has the burden of proving that funds are available for garnishment. *See Hermitage Ins. Co. v. Salts,* 698 N.E.2d 856, 859 (Ind.Ct.App.1998). Nor do they dispute that once a creditor has made a *prima facia* showing, the garnishee must demonstrate a countervailing interest in the property or assert defenses to the garnishment. *See id.* CCCS argues that its interests in the debtors' assets have priority because they were transferred by effective security agreements.

CCCS enters into debt restructuring agreements with debtors involving submission of funds to CCCS in installments, which are in turn used by CCCS to settle debts with a debtor's various creditors, generally also accomplished through in-

stallment payments. As part of the debt restructuring agreement, CCCS seeks to acquire a security interest in the debtor's assets. This is done to ensure the debtor's performance under the debt restructuring agreement by securing both the obligation to cooperating creditors and the obligation for CCCS's fees, while also acting in a fashion of "asset protection" from uncooperative creditors. In the present consolidated appeal, CCCS argues that the trial court erred in finding the transference of security interests from Performance and Just the Fax to CCCS to be void because CCCS fulfilled the requirements of properly attaching and perfecting these security interests.

■■■ The term "attachment" encompasses creation of a security interest by execution of a security agreement between the parties, while "perfection" is an additional step that makes the security interest effective against third parties. *Fifth Third Bank v. Comark, Inc.*, 794 N.E.2d 433, 438 (Ind.Ct.App.2003). "A security interest is enforceable against the debtor and third parties with respect to the collateral if value has been given, the debtor has rights in the collateral, and the debtor has authenticated a security agreement describing the collateral." *National City Bank of Ind. v. All–Phase Elec. Supply Co.*, 790 N.E.2d 488, 490 (Ind.Ct.App.2003) (citing Ind.Code § 26–1–9.1–203(b)). Perfection of a security interest, which gives a creditor priority in the collateral to the exclusion of unperfected and subsequently perfected creditors, is generally accomplished by possession of the collateral, or by filing a financing statement with the Indiana Secretary of State. Ind.Code §§ 26–1–9.1–322, –313, –501. A security interest must attach before it can be perfected, and if a security interest is not perfected prior to issuance of a judicial lien, then the security interest may be rendered subordinate to that judicial lien. Ind.Code § 26–1–9.1–317. Thus, "[f]or a security interest to be effective against third parties, it must have attached to the collateral and be perfected." *National City Bank of Ind.*, 790 N.E.2d at 490.

In the present case, there is no dispute as to attachment of CCCS's claimed security interest regarding whether the debtors had rights in the property. Questions arise, however, over the establishment of authenticated security agreements conferring the interests, and whether value was given for the interests conferred. In order to be enforceable under Indiana law, a security agreement must be authenticated, which means "to sign[,] or to execute or otherwise adopt a symbol, or encrypt or similarly process a record in whole or in part, with the present intent of the authenticating person to identify the person and adopt or accept a record." Ind.Code § 26–1–9.1–102(7).

■■■ During the consolidated hearing, the trial court considered the question of CCCS's purported security interests. Other than the testimony of their Senior Debt Manager, CCCS did not submit evidence establishing the existence and attachment of authenticated security agreements in either of the judgment defendants' assets. With regard to Just the Fax, CCCS's garnishment interrogatory responses were entered into evidence by XSE. These did not allege the existence of a security interest, or include relevant supporting documentation, without which CCCS did not demonstrate a countervailing interest or defense to garnishment.

With regard to Performance, however, CCCS's garnishment interrogatory responses, which were admitted into evidence by Grainger, included an affirmative reply to whether CCCS claimed a perfected security interest in Performance's as-

sets. Grainger reserved an objection to the admissibility of the largely illegible security agreement between Performance and CCCS, attached to its responses, as well as the unsigned blank exemplar agreement meant to facilitate a reading of the illegible document, and an uncertified financing statement purported to have been filed with the Indiana Secretary of State. CCCS did not attempt to authenticate these documents through the testimony of its Senior Debt Manager. This was not enough to establish a security agreement with Performance. In both cases, then, CCCS failed to prove a countervailing interest or defense to the garnishment of funds transferred to it.

 Even if the evidence supported the existence of CCCS's claimed security agreement with Performance, thus satisfying one requirement of the security interests attachment, CCCS fails to establish attachment otherwise because CCCS did not present evidence showing the extent to which value was given by CCCS for the transference of the security interest. The facts of record indicate that CCCS, at the time of the transfer, promised to contact creditors as submitted by Performance to arrange for implementation of the debt restructuring agreement. CCCS had not yet contacted any creditors at the time the purported security interest in Performance's assets was transferred, totaling $113,027.82.[2] CCCS did not provide any evidence of valuation of its services coinciding with the amount of this security interest in Performance's assets, or for the amounts later transferred to it by the debtors, which CCCS disbursed to its own bank account.

Under the Uniform Fraudulent Transfers Act (UFTA), as adopted in Indiana,

> [v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied. *Value does not include an unperformed promise* made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.[3]

Ind.Code § 32–18–2–13(a) (emphasis added). CCCS argues that application of the UFTA supplants Article 9 of the Uniform Commercial Code (UCC), as adopted in Indiana, which exclusively controls all secured transactions. Yet, we note that the Uniform Commercial Code does not include a definition of the term "value," and that utilizing the UFTA's definition in the current context only supplements, rather than supplants, the language of the UCC. As such, the only value CCCS could have given the debtors at the time the transfer took place, and in order to satisfy the requirements for attachment of a security interest, would have been that of whatever minimal services CCCS had rendered prior to contacting any of the debtors' creditors. Any security interest CCCS had in the assets of Performance or Just the Fax would have been correspondingly minimal.

The resulting consequence is that once CCCS had notice of the garnishments, it could not claim more than a minimal interest in the funds transferred to it as assets

---

**2.** Because in its answers to the garnishment interrogatories CCCS did not allege to have a security interest in the assets of Just the Fax, and no documents were submitted showing otherwise, it can only be assumed that its agreement with Just the Fax was also premised on the promise to contact creditors and administer the restructured debt.

**3.** Here, CCCS did not take the purported security interests to secure or satisfy a prior debt owed to it. Nor did CCCS lend money or assume any of the debtors' obligations, but only contracted to act as the debtors' agent for purposes of debt restructuring.

covered in the purported security agreements. Indeed, CCCS explains that the money transferred to it by Performance and Just the Fax does not belong to the debtor or to CCCS prior to disbursement. Brief of Appellant at 12. We reject this as illogical. Simply put, some party must have had an ownership interest in the funds. The amount of the funds received by CCCS in excess of its minimal interest, assuming attachment of any security interest, results in CCCS playing a double role similar to that of a bank in relation to its depositors. CCCS is both a creditor with a purported minimal interest in the debtors' assets, as well as an agent holding the remainder of the funds for the benefit of its client-debtor. To the extent CCCS had not earned an interest in the funds in its possession, the debtors retained an ownership interest in them, and they were accessible for payment of the garnished amounts to XSE and Grainger. *First Bank of Whiting*, 509 N.E.2d at 198. However, because we have held that CCCS did not establish it held even minimal security interests enforceable against the debtors' assets, even the minimal amount to which CCCS might have been entitled was available to satisfy the garnishments.[4] Ultimately, CCCS is liable for failure to turn over the funds as required, or for paying out funds in a manner inconsistent with the trial courts' orders. *Radiotelephone Co. of Indiana, Inc. v. Ford*, 531 N.E.2d 238, 241 (Ind.Ct.App.1988).

### III. Transfer of Funds to CCCS

■ It is longstanding law in Indiana that once the lien in favor of a creditor is created, a third party cannot affect that lien by any act without the consent of the creditor. *Id.* (citing *Pouder v. Tate*, 132 Ind. 327, 330, 30 N.E. 880, 881 (1892)). At the consolidated hearing, CCCS submitted its account statements for Performance and Just the Fax. These showed that at the end of September 2003, CCCS had received $9,426.51 from Performance. Prior to service of garnishment interrogatories in the Grainger action, CCCS disbursed $1,613.94, of which the majority was deposited into its own account. By the end of November 2003, a total of $22.60 had been paid to Performance's creditors, while CCCS paid itself the remainder, including $7,812.57 after being served with garnishment interrogatories.

CCCS received payments totaling $27,177.66 from Just the Fax, of which $26,038.91 was disbursed to CCCS. On December 4, 2003, when the garnishment interrogatories for the XSE action were served, CCCS held undisbursed funds in the amount of $21,438.10. By the end of December, the entire amount was disbursed to CCCS.

The trial courts held that while there was "nothing untoward, *per se*, in … mere retention of CCCS to serve as [an] agent to attempt negotiation" of a restructured debt, "[i]t is taken too far … when the agent becomes a 'straw man' of his principle for purposes of shielding assets from creditors." Appendix of Appellant at 94. With this rationale, the trial courts found the transfers to be fraudulent under the UFTA as "made for the express purpose of hindering and delaying the efforts of creditors from realizing upon the property of the debtor in satisfaction of claims." *Id.* at 93–94. The UFTA states:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was

---

4. While this minimal amount may not have been covered as a secured interest, CCCS could also have asserted its right to setoff for services rendered, upon showing the value of such services. CCCS did not do this.

made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

Ind.Code § 32–18–2–14.

CCCS does not argue that this provision is inapplicable, but rather asserts that insufficient notice was given to provide an opportunity for response to this issue. CCCS contends that Grainger and XSE should have been required to plead fraud with specificity. However, because proceedings supplemental are summary in nature, no formal pleadings are contemplated, and such specificity is not required. Ind. Trial Rule 69(E). *See Coak v. Rebber,* 425 N.E.2d 197, 200 (Ind.Ct.App.1981). Moreover, "proceedings supplemental are not an inappropriate vehicle to employ to set aside alleged fraudulent transfers" because these proceedings "originated in equity as remedies to the creditor for discovering assets, reaching equitable and other interest[s] not subject to levy and sale at law[,] and to set aside fraudulent conveyances." *Stuard v. Jackson & Wickliff Auctioneers, Inc.,* 670 N.E.2d 953, 955 (Ind.Ct.App.1996). Thus, the trial courts' consideration of these transactions was a near certainty, and CCCS's notice argu-

ment is meritless. *Coak,* 425 N.E.2d at 200.

Secondly, CCCS argues that there was insufficient evidence to establish actual intent to hinder, delay, or defraud Grainger and XSE. CCCS contends "it can only be inferred that Debtors intended to retain CCCS to help pay their creditors." Reply Brief of Appellant at 20 (emphasis omitted). We disagree that this is the singular inference to be drawn. Rather, the transfers at issue were also intended to prevent some creditors from obtaining remuneration to which they were legally and equitably entitled. The trial courts' conclusion that CCCS utilized its purported security interests as a shield to protect the assets of Performance and Just the Fax from Grainger and XSE by concealing them in plain sight is supported by the record. In particular, CCCS's intent is made clear in its own marketing materials. The brochure entered into evidence explains that CCCS employs "asset protection strategies" in order to stop legitimate creditors from pursuing legal remedies for full payment:

> Our *Asset Protection Strategies* can stop litigating creditors from bypassing [CCCS] and getting paid ahead of cooperating creditors. When creditors learn that assets are secured, it decreases their motivation to sue and increases their motivation to settle. The debtor's outlook improves and gives cooperating creditors greater assurances of being paid.

Exhibits at 26 (emphasis in original). This statement in concert with CCCS's actions regarding the majority of the funds transferred to it by Performance and Just the Fax, especially the disbursement of amounts to itself after receiving garnishment interrogatories, is proof of actual intent to hinder or delay Grainger and XSE

sufficient to satisfy the UFTA. Moreover, the fact that a portion of these transfers may have been used as partial payments to the debtors' creditors does not prevent the transactions from being fraudulent. *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir.2002). "The seeping back of the transferred money or property to the transferor is strong evidence of actual fraud[,]" which leads to the implication that a debtor is "parking [its] money in a place where [it] hope[s] ... creditors won't know to look." *Id.*

A determination of fraudulent intent in these transfers is also supported through application of the common law badges of fraud. Fraudulent intent may be inferred from various factors present in a given transaction, which include:

1. transfer of property by a debtor during the pendency of a suit;

2. transfer of property that renders the debtor insolvent or greatly reduces his estate;

3. a series of contemporaneous transactions which strip a debtor of all property available for execution;

4. secret or hurried transactions not in the usual mode of doing business;

5. any transaction conducted in a manner differing from customary methods;

6. a transaction whereby the debtor retains benefits over the transferred property;

7. little or no consideration in return for the transfer; and

8. a transfer of property between family members.

*Greenfield v. Arden Seven Penn Partners, L.P.*, 757 N.E.2d 699, 704 (Ind.Ct.App. 2001), *trans. denied.* "As no single indicium constitutes a showing of fraudulent intent per se, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern of fraudulent intent." *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind.Ct.App.1995), *trans. denied.* The circumstances surrounding the disbursements of funds reveal several facts in alignment with the badges of fraud. Funds were transferred from Performance and Just the Fax to CCCS just prior to and during litigation. These transfers greatly reduced the debtors' assets, and were not customary within the debtors' ordinary courses of business. The only consideration arguably received at the time of the transfers was an unperformed promise to each debtor. Lastly, Performance and Just the Fax retained an interest in the funds after they were transferred to CCCS. As such, by application of the badges of fraud, there are sufficient indicia of fraudulent intent in the present circumstances to warrant holding the transfer of funds to CCCS void.

Because Indiana Code section 32–18–2–14 is disjunctive, actual intent to hinder or delay a creditor is enough to render a transfer fraudulent. For this reason, we need not perform an analysis of whether a reasonably equivalent value was received for the transfer. However, as noted in our consideration of whether CCCS retained secured interests in the assets of Performance and Just the Fax, value does not include an unperformed promise under Indiana law, which appears to be all CCCS gave these debtors at the time of the transfers.

## IV. Contempt

### A. Standard of Review

Whether a party is in contempt of court is a matter within a trial court's discretion, and will only be reversed for an abuse of that discretion when its decision is against the logic and effect of the facts and circumstances, or is contrary to law. *Norris v. Pethe*, 833 N.E.2d 1024, 1029

(Ind.Ct.App.2005). We will neither reweigh the evidence nor judge the credibility of witnesses, and our review is limited to consideration of the evidence and reasonable inferences drawn therefrom in support of a trial court's judgment. *Id.* Therefore, the trial court's judgment will be affirmed unless we have a firm and definite belief that the trial court made a mistake. *Id.*

### B. The Grainger Action

■ At the hearing on proceedings supplemental, the trial court found CCCS to be in contempt with regard to the Grainger action for failure to honor the Continuing Order in Asset Garnishment issued November 5, 2003. CCCS argues that it did not disburse funds belonging to Performance because Performance transferred its rights to the funds through a valid security agreement.[5] However, as previously discussed, we find that the purported security agreement between CCCS and Performance did not attach, and was therefore ineffective. Thus, the trial court did not err in finding CCCS in contempt of the order. Nor did it impose an improper sanction when it required disgorgement of all funds transferred to CCCS by Performance. The Garnishment Order required CCCS to pay whatever funds it had toward the total balance owing of $27,408.94, which CCCS failed to do, in addition to disbursing some of those very funds to its own account.

### C. The XSE Action

■ CCCS was found to be in contempt of the trial court in the XSE action due to its failure to answer interrogatories or appear for a hearing in the proceedings supplemental, as well as for disbursing funds transferred to it by Just the Fax, which were in its possession or control at the time the order was served upon it. The facts are clear that on December 4, 2003, CCCS was served with an order to answer garnishment interrogatories by a certain deadline or appear at the proceedings supplemental hearing, and that it failed to do either. At the time the order was served on CCCS, it held undisbursed funds in the amount of $21,438.10. By the end of December, CCCS had disbursed the entire amount to itself. CCCS has neither established a security interest in Just the Fax's assets, nor offered any explanation for its failure to comply with the trial court's order. For these reasons, the trial court did not err in finding CCCS in contempt.

### Conclusion

The trial courts properly voided CCCS's purported security interests because it was not established that CCCS held an enforceable interest in the assets of either Performance or Just the Fax. Furthermore, the trial courts properly voided the transfer of funds from Performance and Just the Fax to CCCS as fraudulent transfers under Indiana's UFTA. Lastly, the

---

**5.** CCCS also argues that it was not in contempt regarding its failure to answer Grainger's garnishment interrogatories in a timely fashion, or in the alternative, to appear at the hearing on October 28, 2003, because it answered within the time allotted under Indiana Trial Rule 69(E), and prior to the date of the hearing. We note that the trial court's assigned deadline for the interrogatory responses, and the date it assigned for the hearing, were shorter than the twenty days after service required by Trial Rule 69(E). We also note that the original order received by CCCS specifically required that any claim or defense to the proceedings supplemental or garnishment order was to be presented at the hearing, which CCCS failed to do. However, because the trial court found CCCS in contempt due to its failure to comply with the Continuing Order in Asset Garnishment rather than for its late submission of interrogatory responses, we need not decide this issue.

findings of contempt against CCCS were not improper. For these reasons, we affirm the trial courts' separate rulings on the verified petitions for rule to show cause.

Affirmed.

KIRSCH, C.J., and MAY, J., concur.