**PRIME MORTGAGE USA, INC., and David M. Law, Appellants–Defendants,**

v.

**Delie T. NICHOLS, Appellee–Plaintiff.**

No. 49A04–0610–CV–586.

Court of Appeals of Indiana.

April 23, 2008.

Mark J.R. Merkle, Anthony W. Mommer, Krieg DeVault LLP, Michael W. Hile, Bernard L. Pylitt, Ronald G. Sentman, Katz & Korin, PC, Indianapolis, IN, Attorneys for Appellants.

Linda L. Pence, Mary T. Doherty, Sommer Barnard PC, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary

Prime Mortgage USA, Inc. ("Prime"), and David Law (referred to collectively as

the "Defendants") appeal following the trial court's order of default judgments in favor of Delie Nichols as a penalty for the Defendants' discovery violations. The trial court held a hearing on damages, and awarded roughly eight million dollars to Nichols. In a subsequent proceedings supplemental, the trial court issued an order of garnishment on a life insurance policy held by Law.

## Issues

1. Whether Nichols's claim under Indiana Code section 34-24-3-1 (the "Crime Victims Statute") is barred by the statute of limitations;

2. Whether the Defendants were entitled to a jury trial on the amount of damages under the Crime Victims Statute;

3. Whether the trial court abused its discretion in ordering default judgments as a sanction for discovery violations;

4. Whether the trial court's award of damages was proper and supported by the evidence;

5. Whether sufficient evidence existed to hold the Defendants liable under the Crime Victims Statute;

6. Whether the trial court's award of attorney's fees was improper;

7. Whether the trial court improperly determined that Nichols's unpaid compensation constituted "wages" under Indiana Code sections 22-2-5-1 and -2;

8. Whether Nichols's claims are barred by the doctrine of unclean hands; and

9. Whether the trial court's garnishment order was improper under either Indiana Code section 27-1-12-14(e) or Indiana Code section 27-1-12-17.1(f).

We affirm in most respects, but reverse the trial court's judgment against Prime on Nichols's claim for breach of fiduciary duty and the garnishment order and remand for further proceedings.

## Facts and Procedural History

In 1990, Nichols, Law, and two other people formed Prime, which issued 200 shares of stock. After a few years, the other two people left the company, leaving Nichols and Law each in control of 100 shares of Prime stock. At some point, the business relationship between Nichols and Law deteriorated and Nichols informed Law that she wished to sell her stock in Prime. The parties failed to negotiate a buyout, and on May 31, 2001, Nichols filed a complaint seeking the appointment of a receiver and dissolution of Prime, alleging that she and Law were 50/50 shareholders in Prime, in which corporate deadlock existed, and seeking unpaid wages. In their response, the Defendants claimed that Nichols did not have a 50% interest in Prime, as Law had previously issued Prime stock to his daughter and another company employee. The Defendants further claimed that Nichols had authorized such a transaction pursuant to a Share Authorization Document (the "SA Document"), which they claimed Nichols had signed. On April 23, 2003, Nichols filed her amended complaint, adding a claim of breach of fiduciary duty and alleging that Law improperly induced Nichols to sign the SA Document. On April 7, 2005, the trial court granted Nichols permission to file her Third Amended Complaint, in which Nichols deleted the allegation that Law induced her to sign the SA Document and instead claimed that Law forged her signature on the SA Document. Nichols had discovered this forgery by comparing another corporate document, signed in 1993, in which she and Law had amended Prime's Articles of Incorporation (the

"Written Consent"). The signature blocks on the Written Consent and the SA Document were identical, leading Nichols to believe that Law had affixed the signature block from the Written Consent and electronically pasted it onto the SA Document. Clarke Mercer, a forensic document analyst, testified that there was "no doubt" that the SA Document was a forgery. Transcript at 177.[1] Nichols now sought treble damages pursuant to the Crime Victims Statute. The Defendants filed a motion for summary judgment on the Crime Victims Statute count, and the trial court denied this motion on October 14, 2005.

Unhappy with Law and Prime's responses to her discovery requests, Nichols also filed a motion for sanctions. On December 8, 2005, the trial court entered an order granting Nichols's motion for sanctions (the "Sanctions Order"), dismissing the Defendants' counterclaims, and granting default judgments against the Defendants on counts III (breach of fiduciary duty), VI (unpaid wages), and VII (forgery) of Nichols's complaint. The trial court based its Sanctions Order on the grounds that the Defendants produced the SA Document, which the trial court found to be forged, and their "contumacious disregard" of discovery obligations. On January 30, 2006, the trial court denied Law and Prime's motion to certify the Sanctions Order for interlocutory appeal on the issue of whether the Defendants were entitled to a jury trial on the amount of damages under the Crime Victims Statute.

On October 16, 2006, the trial court entered its judgment awarding Nichols $2,500,000 in compensatory damages for the value of her 50% ownership in Prime, trebled to $7,500,000; $6,330.02 in unpaid wages, trebled to $18,990.06; and $402,891.28 in attorney's fees. Prime and Law now appeal. More facts appear below.

## Discussion and Decision [2]

### I. Statute of Limitations

This court has previously held that because "the substance of a claim under [the Crime Victims Statute] is punitive rather than compensatory," such claims are subject to a two-year statute of limitations. *Browning v. Walters*, 616 N.E.2d 1040, 1046 (Ind.Ct.App.1993), *adhered to in relevant part on reh'g*, 620 N.E.2d 28; *see also Clark v. Univ. of Evansville*, 784 N.E.2d 942, 945–46 (Ind.Ct.App.2003). Nichols filed her Third Amended Complaint on April 6, 2005. She argues that because she did not discover the forgery until February 2005, she filed this complaint well within the statutory period. The Defendants argue that because Nichols knew she had sustained an injury because of the SA Document in 2001, her claim for forgery accrued at this point and had run well before she filed her Third Amended Complaint.[3]

### A. Effect of Default Judgment

■ Initially, we must determine whether the Defendants may make this argument after the trial court entered a default judgment as a sanction. If we determine the Defendants may still argue this affirmative defense, we must determine when

---

1. The transcript of the hearings on sanctions and damages is separate from the transcript of the garnishment hearing. We will refer to the transcript of the initial proceedings as the "Transcript" or "Tr." and to the transcript of the garnishment hearing as the "Garnishment Transcript."

2. We held oral argument in this case on January 10, 2008, in Brownsburg Indiana. We thank counsel for their oral advocacy and the Brownsburg Rotary Club for its hospitality.

3. It is not readily apparent from the record precisely when the SA Document was first introduced in court or produced to Nichols.

the cause of action accrued. Although research has disclosed no Indiana case directly addressing this point, a federal district court has held a party may not raise a statute of limitations defense after a trial court has entered a default judgment as a sanction. *United States v. Veal,* 365 F.Supp.2d 1034, 1038 (W.D.Mo.2004) ("[A]ny statute of limitations defense they might have asserted was waived when their pleadings were struck and a default judgment was entered.").

The trial court here did not strike the Defendants' answers and affirmative defenses, but ordered only that default judgments be entered against the Defendants on Nichols's claims and judgments of dismissal be entered against the Defendants on their counterclaims. *Cf. Temora Trading Co., Ltd. v. Perry,* 98 Nev. 229, 645 P.2d 436, 437–38 (1982) (where trial court ordered default judgment, appellate court examined defendant's statute of limitations argument based on facts as alleged in plaintiff's complaint, but declined to examine defenses of res judicata and collateral estoppel, as they were affirmative defenses, which were stricken by the trial court), *cert. denied,* 459 U.S. 1070, 103 S.Ct. 489, 74 L.Ed.2d 632 (1982).

■ Also, in this case, the Defendants filed a motion for summary judgment on the issue of whether Nichols's claim under the Crime Victims Statute was barred by the statute of limitations. The trial court denied this motion on October 14, 2005, before issuing the Sanctions Order. We believe this procedural posture is important, as the denial of a motion for summary judgment is not immediately appealable as of right, but may be appealed after the trial court issues its final judgment. *Keith v. Mendus,* 661 N.E.2d 26, 35 (Ind.

Ct.App.1996), *trans. denied.* As the trial court denied the Defendants' motion for summary judgment prior to its issuance of a default judgment, we will address the issue of whether the trial court properly denied the motion.[4]

### B. Standard of Review

■ Summary judgment is appropriate when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. *Rodriguez v. Tech Credit Union Corp.,* 824 N.E.2d 442, 446 (Ind.Ct.App.2005). However, we review a trial court's grant of summary judgment de novo, construing all facts and making all reasonable inferences from the facts in favor of the non-moving party. *Progressive Ins. Co. v. Bullock,* 841 N.E.2d 238, 240 (Ind.Ct.App.2006), *trans. denied.* When the action accrued is a question of law, as "it is well-established in Indiana law that it is the courts' responsibility to determine, based on the facts of each case, when the cause of action accrues." *Autocephalous Greek–Orthodox Church of Cyprus v. Goldberg and Feldman Fine Arts, Inc.,* 917 F.2d 278, 288 (7th Cir.1990).

### C. When the Cause of Action Accrued

■ Actions under the Crime Victims Statute are subject to the discovery rule, under which "a cause of action accrues, and the statute of limitations begins to run, when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sus-

4. We therefore find it unnecessary to determine whether a party may raise a statute of limitations defense following a default judg-

ment where that party did not file a motion for summary judgment based on a statute of limitations.

tained as a result of the tortious act of another." *Doe v. United Methodist Church,* 673 N.E.2d 839, 842 (Ind.Ct.App.1996), *trans. denied.* When the fraudulent party conceals discovery of the fraud, the statute of limitations is tolled until discovery of the fraud.[5] *State v. Puckett,* 531 N.E.2d 518, 524 (Ind.Ct.App.1988). However, "the failure of the plaintiff to exercise reasonable care and diligence to discover any fraud precludes the tolling of the statute." *Id.* "The exercise of reasonable diligence means simply that an injured party must act with some promptness where the acts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his had been invaded or that some claim against another party might exist." *Bambi's Roofing, Inc. v. Moriarty,* 859 N.E.2d 347, 356 (Ind.Ct.App.2006).

In regard to actions involving fraud, our supreme court has stated:

> In order to prevent the running of the statute of limitations in proceedings for relief on account of fraud, it must appear not only that the complainant was in ignorance of the fraud, but also that he did not have possession of the means of detecting the fraudulent arrangement. If the fraud, although not discovered, ought to have been discovered, and could have been if reasonable diligence had been exercised by the plaintiff, the statute will run from the time discovery ought to have been made. To prevent the barring of an action, it must appear that the fraud not only was not discovered, but could not have been discovered with reasonable diligence, until within

the statutory period before the action was begun.

*Guy v. Schuldt,* 236 Ind. 101, 138 N.E.2d 891, 895–96 (1956) (quoting 34 A. Jur., Limitations of Actions, § 167); *see also Jackson v. Jackson,* 149 Ind. 238, 47 N.E. 963, 964 (1897) ("[W]hile the fraud in a particular case may be sufficient to give the complaining party a right of action, still it may not, in the same case, be also sufficient to serve to conceal the cause of action within the contemplation of the law."); *Kennedy v. Warnica,* 136 Ind. 161, 36 N.E. 22, 22 (1894) ("And where the party knows the fact, or is in possession of the means of detecting it, and neglects to bring his action within the time limited by statute, he will be deprived of his remedy."); *Brown v. Gardner,* 159 Ind.App. 586, 308 N.E.2d 424, 429 (1974) (recognizing that the fraud must bear "relationship to the late commencement of the action").

However, this general rule regarding discovery of fraudulent acts is somewhat altered when the party committing the fraud stands in a fiduciary relationship to the party against whom the fraud is committed. Two Indiana cases indicate that when the parties involved are shareholders in close corporations, the statute of limitations is tolled pursuant to Indiana Code section 34–11–5–1 [6] until discovery or disclosure of the fraud. *Lowry v. Lowry,* 590 N.E.2d 612, 620 (Ind.Ct.App.1992), *trans. denied; Dotlich v. Dotlich,* 475 N.E.2d 331, 341–42 (Ind.Ct.App.1985), *trans. denied, abrogated on other grounds, State Bd. of Tax Comm'rs v. Town of St.*

---

5. Actions for common law fraud are subject to a six-year statute of limitations. Ind.Code § 34–11–2–7. Although the two-year statute of limitation applies here, *see Browning,* 616 N.E.2d at 1046 n. 3, cases analyzing when a cause of action accrues for common law fraud are relevant.

6. This statute states in full: "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action."

*John,* 751 N.E.2d 657 (Ind.2001).[7] Generally, this code section will toll the statute of limitations only where there is some sort of "active or intentional concealment." *Forth v. Forth,* 409 N.E.2d 641, 644 (Ind. Ct.App.1980). However, this court in *Lowry* and *Dotlich* noted that members of close corporations have a fiduciary duty to operate fairly, honestly, and openly, and that "the duty to disclose stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders." *Lowry,* 590 N.E.2d at 620 (quoting *Dotlich,* 475 N.E.2d at 342); *see also Malachowski v. Bank One, Indianapolis,* 590 N.E.2d 559, 563 (Ind.1992) ("A mere failure to disclose, when there is a duty to disclose, may be sufficient to toll the statute."); *INB Nat'l Bank v. Moran Elec. Serv., Inc.,* 608 N.E.2d 702, 708 (Ind. Ct.App.1993) ("The statute of limitations for a cause of action against a director of a close corporation for the misappropriation of corporate assets is tolled until the director's wrongful conduct is either disclosed or discovered."), *trans. denied.*

▪ Given this rule, we still must determine whether the Defendants "disclosed" the forgery by providing Nichols and the trial court with the SA Document. In making this determination, we recognize that parties must "exercise due diligence in discovering their putative claim." *Malachowski,* 590 N.E.2d at 564. Nichols stated in her Third Amended Complaint, "after seeing the [SA Document] after this litigation was filed, [Nichols] had merely

assumed that she had signed the [SA Document] because it was not unusual for Mr. Law to give her documents to sign and the signature on it looked the way Nichols signed her name." Appellants' Appendix at 441. The forgery was discovered shortly after Nichols changed attorneys in August 2004. Nichols's new attorney "immediately set out to learn the documents and factual background in this case and to obtain documents and information from the defendants." *Id.* Counsel "began to question the authenticity of the [SA Document]" and subsequently determined that the signatures on the Written Consent were identical to those on the SA Document. *Id.*

The Defendants argue that the forgery was "disclosed" in 2001 when Nichols was provided access to the SA Document; the Written Consent has been on file with the Secretary of State since 1993. *See* Appellant's App. at 8;[8] *see also Dolatowski v. Merrill Lynch, Pierce, Fenner & Smith,* 808 N.E.2d 676, 681 (Ind.Ct.App.2004) (where defendant mailed an allegedly false letter to plaintiff, "[s]imply put, [the defendant] did not conceal the allegedly false letter"); *Ballard's Estate v. Ballard,* 434 N.E.2d 136, 142 (Ind.Ct.App.1982) (holding that "no justification exists for suspending operation of the statute of limitations" in a suit filed by the estate against the defendant for fraud where the defendant had previously shown the contract allegedly obtained by fraudulent inducement to other heirs of the decedent's estate).

---

7. Both *Lowry* and *Dotlich* were decided under the former, but substantially similar, version of this statute, Indiana Code section 34–1–2–9 (1997), which stated: "If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the cause of action."

8. It appears from the matters designated on the Defendants' motion for summary judgment that Nichols was provided with the Written Consent early in the discovery process. However, there is no explicit evidence of the time at which the Defendants gave her the Written Consent.

Therefore, the Defendants point out that Nichols had access to all the information needed to discover the forgery for more than two years before she filed her Third Amended Complaint; she knew that the Defendants were claiming she had authorized the distribution of Prime stock and that she had not in fact authorized such distribution.[9] *See Spolnik v. Guardian Life Ins. Co. of Am.,* 94 F.Supp.2d 998, 1005 (S.D.Ind.2000) (recognizing that even if the plaintiff "could not be presumed to recognize his own signature, he certainly should have known whether or not he did, in fact, authorize the Endorsement"); *cf. McGinley v. McGinley,* 7 Neb.App. 410, 583 N.W.2d 77, 81–82 (1998) (holding wife could have discovered her husband had forged her signature where husband had told wife he had sold property, she knew she had not signed a warranty deed to their home, and the forged warranty deed was "an easily discoverable public record").

However, as Law stood in a fiduciary relationship to Nichols, we now turn to a closer examination of the two cases involving fraudulent concealment in the context of a close corporation. *Lowry* involved a close corporation consisting of family members. The children, minority shareholders, brought suit against their mother and father's estate after discovering their parents had wasted corporate assets, received excessive compensation, diverted corporate assets to their personal use, and mismanaged the corporation. The Defendants raised the defense of the statute of limitations, as the children filed suit more than six years after some of the fraudulent acts. This court held the statute of limitations was tolled because the parents had concealed their fraud by not allowing the

children to access the corporate checkbook or corporate tax information, falsifying their own tax documents, and refusing to divulge any information regarding their activities when asked by the children. 590 N.E.2d at 620. Therefore the shareholders in *Lowry* not only committed fraudulent acts, but also failed to disclose any information that could have led to the discovery of the fraud and took affirmative steps to conceal the cause of action by falsifying tax documents, refusing access to corporate information, and refusing to answer the other shareholders' questions.

*Dotlich* involved a business owned by four brothers, who operated a heavy equipment rental business. In 1951, while the business was organized as a partnership, the brothers decided to purchase property in Speedway on which to store the equipment, and decided the property would be titled in the name of one brother, Monnie. In 1964, the brothers reorganized the business into a corporation and purchased other pieces of real estate, which, unbeknownst to two of the brothers, were also titled in Monnie's name. These pieces of property were maintained with corporate funds and were listed on corporate tax returns as assets. *Id.* at 336. In 1976, one brother discovered that all the real estate purchased by the corporation was in Monnie's name. He attempted to convince Monnie to transfer title over to the corporation, but Monnie refused. Two brothers finally brought suit in 1979. Monnie raised the defense of the statute of limitations, arguing that the cause of action accrued in 1964, when the corporation was formed. The court held the statute of limitations was tolled, concluding the other brothers "were justified in believing the Speedway property was owned by the cor-

---

**9.** The cause of action certainly could not have accrued earlier than this time, as Law had not yet disclosed the existence of the SA Document, and, being forged, Nichols clearly had no reason to know of its existence prior to disclosure.

poration until notified otherwise by Monnie," and that the cause of action did not accrue "until [the other brothers] were made aware of Monnie's exclusive claim due to Monnie's fiduciary duty to disclose." *Id.* at 341–42. In so holding, the court noted that the properties were purchased for use by the brothers' business and the buildings were constructed on the property by the business. *Id.* at 342. Again, like in *Lowry,* Monnie not only committed fraud, but also, independent of this fraud, concealed the fraud from the brothers.

 Similarly, Law not only committed fraud by forging the SA Document, but also committed further fraud by presenting the SA Document to the trial court, alleging it to be a legitimate and valid document. Although this act is different than the acts of concealment in *Lowry* and *Dotlich,* we view it is an act of concealment nonetheless. Although parties to business deals should be wary of fraudulent conduct amongst themselves, parties to a lawsuit should be entitled to proceed under the assumption that the opposing party will not commit a flagrant act of fraud upon the court. By submitting the SA Document to the trial court, Law committed one of the worst acts of discovery misconduct upon the trial court that this court can recall. Further compounding the concealment was the nature of this forgery. Law did not merely sign Nichols's name to the SA Document, but instead copied and affixed a signature block from a document that Nichols had actually signed. Therefore, Nichols was confronted with a situation where a fellow member of a close corporation presented a document affixed with a copy of her signature to a court of law. Under these circumstances, we conclude that Law had not yet disclosed the forgery to Nichols, and that the statute of limitations had not run

at the time Nichols amended her pleadings to allege forgery.

## II. Motion for Jury Trial

 The Defendants next argue the trial court improperly held a hearing and determined damages instead of granting the Defendants' motion for a jury trial on the issue of damages.

Nichols makes two arguments in response, the first of which is that the nature of her suit sounds in equity, and that therefore the Defendants were not entitled to a jury trial. "Any party may demand a trial by jury of any issue triable of right by a jury" by filing a demand with the trial court and the other parties. Ind. Trial Rule 38(B). It is not disputed that the Defendants properly and timely requested a jury trial.[10] Our supreme court has characterized the right to a jury trial in a civil case involving multiple claims as follows:

> If the essential features of a suit as a whole are equitable and the individual causes of action are not distinct or severable, the entitlement to a jury trial is extinguished. The opposite is also true. If a single cause of action in a multi-count complaint is plainly equitable and the other causes of action assert purely legal claims that are sufficiently distinct and severable, Trial Rule 38(A) requires a jury trial on the legal claims.

*Songer v. Civitas Bank,* 771 N.E.2d 61, 68 (Ind.2002).

 Nichols's claim for breach of fiduciary duty is an equitable claim. *See Wenzel v. Hopper & Galliher, P.C.,* 830 N.E.2d 996, 1001 (Ind.Ct.App.2005). Damages under the Crime Victims Statute are comparable to punitive damages. *See Blankenship v. McKay,* 534 N.E.2d 243,

---

**10.** We also note Nichols requested a jury trial in her Third Amended Complaint.

244 (Ind.Ct.App.1989) ("[A]ll recoveries under [the Crime Victims Statute] to the extent they exceed actual damages, would seem to fall within the scope of 'punitive damages' simply because they are not compensatory and are designed to deter the conduct which resulted in the damages complained of."). Whether to award and the amount of punitive damages are generally issues properly submitted to the jury. *See Williams v. Younginer,* 851 N.E.2d 351, 358 (Ind.Ct.App.2006), *trans. denied; Gray v. Westinghouse Elec. Corp.,* 624 N.E.2d 49, 54–55 (Ind.Ct.App.1993), *trans. denied.* Further, actions for money damages are considered legal in nature, and are therefore actions for which a party has a right to a jury trial. *See Cunningham v. State,* 835 N.E.2d 1075, 1079 (Ind.Ct.App. 2005), *trans. denied; Kirk v. Harris,* 173 Ind.App. 445, 447, 364 N.E.2d 145, 147 (1977) ("A jury trial on the issue of damages is a factual hearing, and, as such, the right to a jury trial is as of right upon demand by 'any party.'" (quoting Trial Rule 38)), *superceded by* the current Indiana Trial Rule 38. Nichols's claim for wages is likewise a legal issue for which a party is entitled to a jury trial. *Cf. Ayres v. Smith,* 227 Ind. 82, 90, 84 N.E.2d 185, 189 (1949) ("The fact that in the same proceedings [plaintiff] also sought recovery of a money judgment for the unpaid portion of her services did not change the equitable issues."); *McKinney v. Springer,* 6 Blackf. 511, 1843 WL 2945 at *3 (Ind. 1843) (suit to recover the value of work done by the plaintiffs involved a legal issue for which the court of law was the proper tribunal).

■ Therefore, we have a situation where one of Nichols's claims sounded in equity and the other two sounded in law. Under these circumstances, a party is generally entitled to a jury trial. *See Songer,* 771 N.E.2d at 68. Further, the amount of damages may be viewed as distinct from the issue of the Defendants' liability. *See Whisler v. Bank of Henry County,* 554 N.E.2d 17, 21 (Ind.Ct.App.1990) ("[E]ven if the issue of liability were to be deemed outside the realm of jury deliberation in the present case, Trial Rule 8(D) would not prevent a jury trial to be held on the issue of damages.").

However, as this case involves a default judgment, we now turn to Indiana Trial Rule 55(B), which states:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearing or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required.

In arguing Trial Rule 55 protects their right to a jury trial, the Defendants cite *J.C. Marlow Milking Mach. Co. v. Reichert,* 464 N.E.2d 364, 365 (Ind.Ct.App. 1984), *trans. denied,* in which this court held "[w]hen using the drastic remedy of default as a discovery sanction under T.R. 37(B), the trial court must follow the provisions of T.R. 55 concerning procedures for issuing default judgments." The Defendants argue that under *Reichert,* they are entitled to a jury trial as to damages pursuant to Trial Rule 55(B), which specifically provides for a jury trial as to damages following a default judgment.

In response, Nichols cites to *Mallard's Pointe Condominium Ass'n, Inc. v. L & L Investors Group, LLC,* 859 N.E.2d 360, 364 (Ind.Ct.App.2006), *trans. denied,* in which this court noted that *Reichert* was decided under the prior version of Trial

Rule 37[11] and held that under the present version, "we no longer require strict compliance with the hearing requirement of Indiana Trial Rule 55," and instead "evaluate whether the sanction of an entry of default judgment is unjust." The court went on to hold that the trial court did not abuse its discretion in entering default judgment and determining the amount of damages without first holding a hearing. *Id.* at 365.

We conclude that under *Mallard's Pointe*, Trial Rule 55's protection of the right to a jury trial is inapplicable. Although this case involves the trial court's denial of a motion for a jury trial instead of the trial court's failure to hold a hearing, it would be illogical to hold that a trial court may decline to hold any hearing but is required to hold a jury trial. To the extent that Law argues *Mallard's Pointe* was incorrectly decided, we decline his invitation to revisit our previous decision.

We conclude the Defendants were not entitled to a jury trial, and that the trial court acted within its discretion in rejecting the Defendants' request for a jury trial.

### III. Propriety of Sanctions Order

#### A. Trial Court's Order of Default Judgment as a Discovery Sanction

##### 1. Standard of Proof

The parties disagree as to the applicable burden of proof necessary to justify the sanction of default judgment. The Defendants, citing a Seventh Circuit case, argue that the trial court must have "clear and convincing evidence of willfulness, bad faith or fault." *See* Appellant's Br. at 21 (quoting *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir.2003)); cf. *Shepherd v. Amer. Broad. Cos., Inc.*, 62 F.3d 1469, 1472 (D.C.Cir.1995) (holding that a district court must find by clear and convincing evidence that a party engaged in abusive

---

**11.** The prior version of Trial Rule 37(B) stated:

(B) Sanctions—Contempt, damages and default. To avoid abuse of discovery proceedings and to secure enforcement of the discovery provisions of these rules in any enforcement or protective proceedings under the discovery provisions of these rules or upon motion and notice by a party, witness or person to any persons affected thereby:

(1) The court may enforce the attendance of witnesses by attachment, and punish disobedience of a subpoena or order issued or made under these discovery rules as a contempt of court in the manner as provided in Rule 45(F).

(2) The court may allow expenses, including reasonable attorney's fees, incurred by a party, witness or person, against a party, witness or person responsible for unexcused conduct that is:

(a) punishable for disobedience of a subpoena or order under subdivision (B)(1) of this rule; or

(b) in bad faith and abusively making or seeking a deposition, interrogatories, pro-

duction of evidence, inspection, examination, request, question, enforcement order, subpoena, protective order or any other remedy under the discovery provisions of these rules; or

(c) in bad faith and abusively resisting or obstructing a deposition, interrogatories, production of evidence, inspection, examination, request, question, enforcement order, subpoena, protective order or any other remedy under the discovery provisions of these rules.

(3) The court may order evidence upon matters to be taken as established or may order that evidence upon matters be refused as against a party subject to subdivision (B)(2) of this rule.

(4) The court may enter total or partial judgment by default or dismissal with prejudice against a party who is responsible under subdivision (B)(2) of this rule if the court determines that the party's conduct has or threatens to so delay or obstruct the rights of the opposing party that any other relief would be inadequate.

behavior before invoking its inherent power to enter a default judgment). *But see In re Silberkraus,* 253 B.R. 890, 913–14 (Bankr.C.D.Cal.2000) (disagreeing with *Shepherd* and noting that it "can find no wording in 11 U.S.C. § 105(a), or in controlling Ninth Circuit case law, suggesting that awarding sanctions under the court's inherent power must be based on clear and convincing evidence, rather than the normal standard of proof in civil matters— proof by a preponderance of the evidence"), *aff'd* 336 F.3d 864 (9th Cir.2003). They also argue that this standard extends to the trial court's award of damages following default. Nichols counters that no heightened burden exists, and that even if the burden is clear and convincing evidence, the trial court had such evidence, namely testimony indicating that the SA Document was a forgery.

Research has disclosed no Indiana case indicating that a trial court's decision to impose sanctions must be supported by a particular proportion of the evidence. Instead, we merely refer to reviewing the trial court's sanctions order for an of abuse discretion without discussing the burden of proof applicable to whether or not a defendant committed the applicable discovery violations. *Eg.,Pfaffenberger v. Jackson County Reg'l Sewer Dist.,* 785 N.E.2d 1180, 1185–86 (Ind.Ct.App.2003); *Rivers v. Methodist Hosps., Inc.,* 654 N.E.2d 811, 814 (Ind.Ct.App.1995). Similarly, we have discussed whether a trial court could "reasonably have found" the facts underlying a sanctions order. *Clark County State Bank v. Bennett,* 166 Ind.App. 471, 480, 336 N.E.2d 663, 669 (1975); *see also Whitewater Valley Canoe Rental, Inc. v. Bd. of Franklin County Comm'rs,* 507 N.E.2d 1001, 1007 (Ind.Ct.App.1987) (concluding that "it is reasonable to assume that the court found [the defendant] had shown contumacious disregard for the court's orders."), *trans. denied.*

■ Regardless of the burden of proof, Nichols introduced expert testimony that the SA Document was a forgery. *See* Tr. at 177 (Clarke Mercer, expert in forensic document examination, testifying that there is "no doubt" that the SA Document is a forgery). As this document benefited Law, was under the control of Law, was used by Law, the logical inference is that Law either knew or should have known that it was a forgery. The trial court's findings clearly indicate that it believed Mercer's testimony indicating that "without any doubt" the SA Document was a forgery. *See* Appellant's App. at 41. The record also presents undisputed evidence of the Defendants' responses to discovery. In short, even if Indiana requires clear and convincing evidence of misconduct, the trial court's findings indicate that it believed such a burden was met.

## 2. Defendants' Discovery Conduct

In addition to its findings regarding the Defendants' submission of the forged SA Document, the trial court's Sanctions Order contains the following findings relevant to the Defendants' discovery violations.

17. After Nichols's attempts to informally obtain Prime Mortgage's business records were rebuffed by the defendants, on March 7, 2005, Nichols served a Rule 34 request for original corporate, business and financial records. On the same date, Nichols served six limited interrogatories. On Friday April 8, 2005, defendant Law's counsel left a message for Nichols's counsel that he desired 30 additional days to respond to the Discovery Requests. The following Monday morning, on April 11, Nichols's counsel told defendants that she objected to any additional time because most of the document requests were for docu-

ments that Nichols had requested from the defendants by letter in September 2004, more than seven months previously, and the interrogatories—only six in number—were extremely limited in scope. Nichols also advised defendants' counsel that she was ready to and wanted to inspect original corporate records.... On Tuesday, April 12, at noon, Nichols faxed a letter to the defendants confirming her objection to additional time and the reasons for the objection.

18. On the same day—April 12—defendants filed a motion for an enlargement of time to answer the Discovery Requests. The motion failed to tell the Court that defendants' due date for responding to the Discovery Requests already had passed, failed to demonstrate good cause for missing the deadline, and failed to tell the Court that Nichols had expressed her objection to any motion for additional time. Defendants' professed reason for more time was they had waited to work on responding to discovery pending the Court's ruling on their partial summary judgment motion on March 28, 2005, two weeks before defendants' discovery responses were due.

19. On April 19, 2005, Nichols filed a combined objection to the defendants' request for time and a motion to compel discovery. Nichols asked the Court to order the defendants immediately to respond to the Discovery Requests both by providing written responses and producing the responsive documents.

20. On April 29, 2005, this Court entered its Order granting Nichols's motion to compel discovery and denying the defendants' additional time to answer discovery, allowing defendants until May 16 to comply with the Court's Order.

21. Defendants' responses to the Discovery Requests consisted of objections and refusals to produce documents and produce information for 22 of the 27 document requests and three of the six interrogatories. The only documents defendants produced to Nichols were ones that they already had filed with the Court in connection with their partial summary judgment motion, copies of documents that a non-party had produced to Nichols in 2001, and a group of publicly filed documents involving a foreclosure on certain property later acquired out of bankruptcy. Defendants refused to produce any documents related to Prime Mortgage's financial position.... They also refused to produce Mr. Law's financial statements and tax records.

22. These financial records clearly were relevant and discoverable pursuant to Trial Rule 26....

23. On July 14, 2005, the Court held a 2½ hour hearing on the defendants' refusals to produce documents, as well as the deficiencies in their answers and interrogatories. During the hearing, each and every document request and interrogatory was discussed along with the defendants' responses to that discovery. The Court expressed its serious dismay with the defendants' discovery conduct, calling their responses "duplicitous and downright annoying" and noting that it could not have taken more than 30 minutes of lawyer time to prepare the discovery responses that defendants gave to Nichols.

24. At the conclusion of the July 14 hearing, the Court ordered the defendants to respond fully and completely to the interrogatories and to each and every request for production of documents and to produce all the requested documents....

25. The Court made it absolutely clear at the July 14 hearing that defendants had a 30–day deadline to produce all the requested documents and supplement their written discovery responses, a deadline that the defendants picked themselves and stated that they could comply with. . . .

\* \* \*

27. On August 15, Nichols's counsel . . . [and] accountant experts . . . arrived at the agreed document production at Law's counsel's office.

28. . . . [T]he defendants produced a total of approximately 350 pages of financial data that were printed from a computer; 312 pages of those documents concerned solely a six-month period from January 1, 2005 to June 20, 2005. The defendants did not need 30 days to come up with this paltry response. . . . Nichols still had no documents responsive to [24 of her 27 document requests].

29. Defendants later produced some additional financial information, but still the response was paltry. . . .

30. As for the rest of the information to which Nichols is entitled pursuant to the Court's order, the defendants offered to "open up" Prime Mortgage's offices . . . to Nichols's counsel and expert and let them figure out whether Prime Mortgage had any more documents responsive to Nichols's discovery requests. This offer in no way can be construed as complying with the Court's discovery orders. . . . The defendants also told Nichols that she "may not" even find responsive records dated prior to 2003 because Prime Mortgage had moved offices and "may not" have maintained records. . . .

31. Defendants have known since this case was filed in May 2001 that Nichols sought to recover the value of her interest in Prime Mortgage, and thus have known since then that Prime Mortgage's financial records were relevant and discoverable in this matter. . . . [According to IRS regulations Prime] should have had in its possession financial records dating back to 1998.

32. At this point, defendants have produced less than a box of documents to Nichols, most of which were produced late. Defendants still have not produced the vast majority of the documents requested by Nichols and ordered by the Court.

Appellant's App. at 42–48. The trial court then concluded, among other things that "[t]he defendants' conduct in this case constitutes some of the worst displays of bad faith in the discovery process this court has witnessed." *Id.* at 49. It concluded Law and Prime were "jointly responsible for the discovery misconduct that has occurred." *Id.* It then concluded that the most severe sanction available, default judgment, was appropriate. It noted that Prime and Law had used the forged SA Document to obtain rulings in their favor, and that this conduct was "tantamount to a fraud on the Court itself." *Id.* at 51.

### 3. Standard of Review

Under Indiana Trial Rule 37(B)(2)(c), if a party disobeys a trial court's order regarding discovery, the trial court may issue "[a]n order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." We vest trial courts with wide discretion in dealing with discovery matters and will reverse a trial court's decision regarding discovery only for an abuse of discretion. *Marshall v. Woodruff,* 631 N.E.2d 3, 5 (Ind.Ct.App.1994). We will find such an

abuse "only if it is clearly against the logic and circumstances before the court, or when the trial court has misinterpreted the law." *Mallard's Pointe*, 859 N.E.2d at 364. "While this court acknowledges that the opportunity to be heard in court is a litigant's most precious right and should be sparingly denied, we will not condone disregard for the trial court's orders." *Castillo v. Ruggiero*, 562 N.E.2d 446, 455 (Ind. Ct.App.1990) (quotations and citations omitted), *trans. denied.* "The only limitation on the trial court in determining an appropriate sanction is that the sanction must be just." *Bankmark of Fl., Inc. v. Star Fin. Card Servs., Inc.*, 679 N.E.2d 973, 978 (Ind.Ct.App.1997). In determining whether a sanction is just, we recognize that "[a]lthough a default judgment plays an important role in the maintenance of an orderly, efficient judicial system as a weapon for enforcing compliance with the rules of procedure and for facilitating the speedy determination of litigation, in Indiana there is a marked judicial deference for deciding disputes on their merits and for giving parties their day in court, especially in cases involving material issues of fact, substantial amounts of money, or weighty policy determinations." *Charnas v. Estate of Loizos*, 822 N.E.2d 181, 185 (Ind.Ct.App.2005); *see also Marfia v. T.C. Ziraat Bankasi, N.Y. Branch*, 100 F.3d 243, 249 (2d Cir.1996) (recognizing that because of the extreme nature of default judgments, trial courts should enter them under only extreme circumstances).

### 4. Whether the Trial Court Abused Its Discretion By Entering a Default Judgment

 Although an order dismissing an action or granting a default judgment is the ultimate sanction a trial court may issue, a trial court is not necessarily required to first issue a lesser sanction. *Marshall*, 631 N.E.2d at 5. "This is espe-

cially true when the disobedient party has demonstrated contumacious disregard for the court's orders, 'and the conduct of that party has or threatens to so delay or obstruct the rights of the opposing party that any other relief would be inadequate.'" *Nesses v. Specialty Connectors Co., Inc.*, 564 N.E.2d 322, 326 (Ind.Ct.App.1990) (quoting *Whitewater Valley Canoe Rental, Inc. v. Bd. of Franklin County Comm'rs*, 507 N.E.2d 1001, 1008 (Ind.Ct.App.1987), *trans. denied*).

 When deciding whether a sanction is just, this court has routinely considered whether or not a trial court expressly warned a party that failure to comply could result in dismissal. *See Brown v. Katz*, 868 N.E.2d 1159, 1169 (Ind.Ct.App. 2007); *Drew v. Quantum Sys.*, Inc., 661 N.E.2d 594, 595 (Ind.Ct.App.1996), *trans. denied; see also The Procter & Gamble Co. v. Haugen*, 427 F.3d 727, 741 (10th Cir.2005) (reversing district court's sanction of dismissal where there was no evidence that the district court had warned the plaintiff that failure to comply would result in dismissal). Indeed, we have held that a sanction is not unjust when two conditions are met: "(1) the party in question was given additional time within which to respond and was expressly warned in advance that an ultimate sanction would be entered if he failed to comply, and (2) no response or request for additional time was timely made and no reason excusing a timely response is demonstrated." *Wozniak v. N. Ind. Pub. Serv. Co.*, 620 N.E.2d 33, 36 (Ind.Ct.App.1993), *trans. denied.* However, notice is not necessarily required in every case. *Bankmark*, 679 N.E.2d at 979; *see also Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 353 (9th Cir.1995) (recognizing that a specific warning is not required).

Here, the trial court did not explicitly warn the Defendants that failure to comply with its order would result in default judgment. However, the trial court made clear that it was not pleased with the Defendants' discovery conduct at the July 14 hearing. It told the Defendants that "[i]f [the submitted discovery responses] took an associate or paralegal more than 30 minutes [to prepare] I would fire them. They're all the same . . . [I]t didn't take you any time to file this." Tr. at 63. Further, the trial court indicated, "I am not pleased with these responses. If you haven't caught on by now, I think they are duplicitous, they appear to be vague and downright annoying." *Id.* at 67. It also repeatedly stated that the responses were insufficient, and that although the Defendants' objections to Nichols's discovery requests were "not well taken in terms of final result, are well taken enough to avoid the issuance of sanctions." *Id.* at 105. Thus, the Defendants were clearly aware that the trial court was considering sanctions, and clearly aware that the trial court was requiring the Defendants to respond fully to each document request and produce the requested documents within thirty days. *See id.* at 105–06 ("I therefore order Prime Mortgage to respond fully and completely to each and every . . . request for production."). Although the Defendants did not wholly fail to respond to Nichols's requests, the trial court found their response to be still woefully insufficient and indicating a lack of good-faith effort to comply.

 The trial court also based its issuance of sanctions on the Defendants' production of the forged SA Document. We recognize that Trial Rule 37 does not contain an explicit provision allowing a trial court to base an order for sanctions on a party's production of a forged or otherwise fraudulent document. However, sanctions may be based on "evasive or incomplete" answers. Trial Rule 37(A)(3). "Evade" is defined as "[t]o escape or avoid by cleverness or deceit." The American Heritage Dictionary of the English Language, 615 (4th ed.2000). Producing a forged document is clearly an evasive answer. *Cf. Whitewater Valley Canoe Rental,* 507 N.E.2d at 1007–08 (trial court acted within its discretion in ordering default judgment as a discovery sanction for bad faith in discovery where party "reported documents destroyed or lost which had been the subject of motions for protective orders, and which [that party] had previously claimed were too burdensome to produce").

 In addition, trial courts have the inherent power to punish parties in the course of "maintaining its dignity, securing obedience to its process and rules, rebuking interference with the conduct of business, and punishing unseemly behavior." *City of Gary v. Major,* 822 N.E.2d 165, 169 (Ind.2005). Our supreme court has previously recognized that "[i]n protecting [the] discovery process, the trial court has the inherent power to impose sanctions." *Noble County v. Rogers,* 745 N.E.2d 194, 198 (Ind.2001) (quoting *O'Conner v. State,* 178 Ind.App. 415, 382 N.E.2d 994, 998 (1978), *vacated,* 272 Ind. 460, 399 N.E.2d 364 (1980)); *cf. Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (recognizing that district courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process"); *Upshaw v. State,* 170 Ind.App. 206, 208, 352 N.E.2d 102, 104 (1976) ("The trial court has the inherent power to protect the discovery process by imposing sanctions such as a protective order barring testimony."). The Seventh Circuit has noted that courts have recognized a trial court's inherent power to dismiss a suit based on "bad

faith, fraud, or undue delay by one of the parties." *Kovilic Constr. Co., Inc. v. Missbrenner,* 106 F.3d 768, 773 (7th Cir.1997). As the D.C. Circuit has recognized, "[a]s old as the judiciary itself, the inherent power enables courts to protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, including even dismissals and default judgments." *Shepherd,* 62 F.3d at 1472.

The conduct at bar epitomizes that which entitles a trial court to invoke its inherent powers. *See Qantum Communications Corp. v. Star Broadcasting, Inc.,* 473 F.Supp.2d 1249, 1269 (S.D.Fla.2007) (recognizing that "the inherent powers doctrine is most often invoked where a party commits perjury or destroys or doctors evidence"). Although research has disclosed no Indiana case addressing a trial court's dismissal or grant of default judgment as a sanction for bad faith in discovery, other courts have indicated that such a sanction may be appropriate under circumstances similar to those at bar. *See Pope v. Fed. Express Corp.,* 974 F.2d 982, 984 (8th Cir.1992) (holding that district court had the inherent power to dismiss action where "manufactured evidence and perjured testimony had been introduced in an attempt to enhance the case through fraudulent conduct"); *Stephen Slesinger, Inc. v. Walt Disney Co.,* 155 Cal.App.4th 736, 66 Cal.Rptr.3d 268, 294–95 (2007) (affirming trial court's dismissal as discovery sanction where plaintiff's employee had taken confidential documents from defendant and defendant then altered these documents with the intent to mislead), *review denied; Ramey v. Haverty Furniture Cos., Inc.,* —— So.2d ——, 2008 WL 160970 at *6 (Fla.Ct.App., Jan.18, 2008) (upholding trial court's dismissal of action where plaintiff "provided intentionally false deposition testimony and interrogatory answers"); *cf. Brockton Sav. Bank v. Peat,*

*Marwick, Mitchell & Co.,* 771 F.2d 5, 10 (5th Cir.1985) (recognizing that the district court could have entered a default judgment where evidence indicated that the defendant had either destroyed sought-after documents or "had otherwise flagrantly misled the court or disregarded its orders"), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986).

Although we recognize the extreme nature of the sanction imposed in this case, we also recognize the extreme nature of the misconduct. We agree with the trial court that "[t]he defendant's conduct in this case constitutes some of the worst displays of bad faith in the discovery process this court has witnessed." Appellant's App. at 49; *cf. Allen v. Chicago Transit Auth.,* 317 F.3d 696, 703 (7th Cir. 2003) ("In general the severity of a sanction should be proportioned to the gravity of the offense."). The production of the forged SA Document was a deliberate act of fraud, not only upon Nichols, but upon the trial court. *Cf. Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 245, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (affirming order vacating previous judgment where judgment had been rendered in reliance on document, which was later shown to be fraudulent, used in procuring a patent, and finding "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals."), *departed from on other grounds, Standard Oil Co. of Cal. v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976). The SA Document went to the heart of the case, and indeed, required Nichols to change the theory on which she proceeded. *Cf. Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C.Cir. 1998) (recognizing that a default judgment may be appropriate where the misconduct "has severely hampered the other party's ability to present his case," or where the

innocent party " 'been so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case.' " (quoting *Shea v. Donohoe Constr. Co.,* 795 F.2d 1071, 1074 (D.C.Cir.1986))). The Defendants perpetrated this fraud over an extended period of time and have still refused to admit the fraudulent nature of the document, despite expert testimony indicating its nature. *See Mullins v. Hallmark Data Sys., LLC,* 511 F.Supp.2d 928, 941 (N.D.Ill.2007) (upholding dismissal where plaintiff's perjury "was not clumsily committed or quickly discovered," and plaintiff did "all in her power to continue to mislead and obstruct the court, even after the truth was discovered"); *cf. Allen,* 317 F.3d at 703 (recognizing that perjuries "clumsily committed and quickly discovered" or that are "harmless so far as affecting the course of the litigation" may not warrant dismissal). By presenting the forged SA Document to the trial court, the Defendants committed "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel–Atlas Glass Co.,* 322 U.S. at 246, 88 L.Ed. 1250. In sum, we conclude the trial court acted within its discretion in determining that the sanction of default judgment was warranted.

### B. Propriety of Judgments Against Both Law and Prime

The Defendants also argue that the trial court improperly entered default judgments against both Law and Prime on all Nichols's claims, as Nichols's complaint did not allege all claims against both parties. They also argue that Prime cannot be held liable on the merits for any alleged breach of fiduciary duty or forgery.

 In regard to the Defendants' first argument, "A defendant is not bound to answer a complaint which, upon its face,

states no cause of action against him. He may rely upon the court not to render an erroneous judgment against him, and, if such a judgment is rendered upon default, he may have it reversed upon appeal." *Old v. Mohler,* 122 Ind. 594, 23 N.E. 967, 968 (1890). As to the sufficiency of a complaint, the plaintiff "must only state sufficient operative facts as to put defendants on notice as to their claims." *Tobin v. Ruman,* 819 N.E.2d 78, 88 n. 7 (Ind.Ct. App.2004), *trans. denied.*

Nichols's third amended complaint states in relevant part:

#### Breach of Fiduciary Duty

\* \* \*

53. Law, as the President of Prime Mortgage and as a shareholder of Prime Mortgage, owes a fiduciary duty to Nichols.

54. Law has breached his fiduciary duty to Nichols and Nichols has been damaged.

#### Unpaid Wages

\* \* \*

57. The basis of Nichols' income from Prime Mortgage constitutes "wages" within the meaning of Ind. Code § 22–2–5–1 *et seq.*

58. Pursuant to Ind.Code § 22–2–5–1 *et seq.,* Nichols is entitled to recover from Prime Mortgage, in addition to the wages owed to her, a sum of money equal to twice the amount of unpaid wages, plus all reasonable attorneys' fees incurred by Nichols in recovering the same from Prime Mortgage.

#### Forgery

\* \* \*

60. With intent to defraud, Law made or uttered the Forged [SA Docu-

ment], the Forged Resignation Document, the Forged Uhls Appointment Document, the Forged Choate Employment Agreement, and the Forged Gardner Employment Agreement, in such a manner that these documents purport to have been made either: (a) by another person; (b) at another time; (c) with different provisions; or (d) by authority of one who did not have authority.

61. Law's actions constitute forgery within the meaning of Ind.Code § 35–43–5–2.

62. Pursuant to Ind.Code § 34–24–3–1, Nichols is entitled to recover an amount not to exceed three times the actual damages suffered because of the forgeries, the costs of this action, reasonable attorneys' fees, and other costs and expenses provided for in the statute.

WHEREFORE, Nichols requests judgment against Law and Prime Mortgage as follows:

* * *

d. That the Court order Law to purchase Nichols' 50% ownership interest in Prime Mortgage at a reasonable price;

e. That the Court appoint an appraiser to appraise the value of Nichols' stock in Prime Mortgage, measured at a 50% ownership interest, and that the Court order Prime Mortgage and/or Law to bear the full costs of said appraisal.

f. That the Court order the payment of dividends that should have been declared by Prime Mortgage;

g. That the Court award damages to Nichols to reasonably compensate her for Law's wrongful acts;

* * *

i. That the Court enter judgment against Prime Mortgage for all amounts owed to Nichols plus statutory penalties thereon;

j. That the Court award punitive damages.

k. That the Court require that Law be removed as President of Prime Mortgage and as a member of its board of directors;

l. That the Court enter judgment against defendants pursuant to the Offenses Against Property Act, Ind. Code § 34–24–3–1.

Appellant's App. at 458–61.

Thus, it appears that the complaint seeks judgment against Prime alone on the count of unpaid wages. However, as Nichols requested judgment against "defendants" under the Crime Victims Statute, the complaint sufficiently put Prime on notice that Nichols was naming both Prime and Law under that claim. Also, although the complaint alleges that Law breached his fiduciary duty without mentioning Prime, the complaint also requests that the "Court enter judgment against Prime Mortgage for *all amounts owed to Nichols.*" *Id.* at 461 (emphasis added). Therefore, the complaint gave adequate notice to Prime that Nichols was seeking judgment against it on the count for breach of fiduciary duty. The question remains, however, as to whether Prime could be held liable on either count.

In regard to the claim for breach of fiduciary duty, our supreme court has addressed this point in *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 246 (Ind.2001).

To the extent Goldsmith as an officer and director breached fiduciary duties to the corporation, Boehm as a shareholder could pursue a derivative action in the name of the corporation. If the corporation were itself liable on such a claim,

the recovery becomes circular. The corporation is the real party in interest as a plaintiff in a derivative suit, and therefore is the party who receives the recovery, not the party who pays for the harm. On the other hand, the theory of a *Barth* [12] recovery is that the minority is compensated only for damages inflicted on the minority shareholders of the corporation, not for injury to the corporation as a whole. If the corporation were liable for that amount, it would essentially require the continuing shareholders, including the minority shareholder/plaintiff, to pay for a portion of the damages awarded to them that were caused by the offending officer/director/shareholder. Once again a part of the recovery would be circular. Here, because Boehm is being bought out, that point is irrelevant. But his claim under *Barth* remains a claim against Goldsmith, not G & N.

In sum, G & N is not liable for the damages awarded due to Goldsmith's breach of his fiduciary duty. Of course, the minority shareholder may seek to satisfy the judgment by execution on the majority's share holdings in the corporation. But awarding a judgment against the majority shareholder and requiring this route to the corporate pocketbook minimizes the risk of preferring the shareholders over creditors if the corporate pot is insufficient to pay the judgment.

 According to this rationale, we conclude that it was improper to grant a judgment against Prime on Nichols's claim for breach of fiduciary duty. However, we note that the Defendants have not explained how this improper entry of judgment should affect the relief granted to

Nichols, and it does not appear that the relief afforded to Nichols is impacted by our reversal of the entry of judgment against Prime on this count.

In regard to Nichols's claim under the Crime Victims Statute, the Seventh Circuit addressed an employer's liability under the previous Crime Victims Statute for an employee's intentional tort in *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 637 (7th Cir.1987). The court recognized that where an employee commits a crime included in the Crime Victims Statute, the victim may maintain a suit against the corporation only in compliance with Indiana Code section 35–41–2–3(a); under this section, "A corporation ... may be prosecuted for any offense; it may be convicted of an offense only if it is proved that the offense was committed by its agent acting within the scope of his authority." The court noted that "the combined effect of the two statutes is to create a statutory version of respondeat superior ... a principle which ... can ... be used to impose liability on a principal for torts committed by an agent." *Id.; see also Roake v. Christensen*, 528 N.E.2d 789, 791–92 (Ind.Ct.App.1988) (holding that a corporation, as well as a corporate officer who had directly participated in the tort, could be liable under the Crime Victims Statute, but also recognizing that it would be improper to hold each party liable for treble damages, as such a situation would result in the plaintiff recovering an amount greater than three times the actual loss).

 Under Indiana Code section 35–41–2–3, a corporation may be held liable for an employee's criminal acts "as long as the employee was acting within the scope of employment." *Hurlow v. Manag-*

---

12. In *Barth v. Barth,* 659 N.E.2d 559 (Ind. 1995), our supreme court held that in certain situations a shareholder may proceed directly against a corporation instead of pursuant a derivative action.

*ing Partners, Inc.,* 755 N.E.2d 1158, 1162 (Ind.Ct.App.2001), *trans. denied; see also Gomez v. Adams,* 462 N.E.2d 212, 225 (Ind.Ct.App.1984) (holding corporation liable for employee's criminal act of conversion). The company may be held liable if the employee's "purpose, was to an appreciable extent, to further his employer's business, even if the act was predominantly motivated by an intention to benefit the employee himself." *Warner Trucking, Inc. v. Carolina Cas. Ins. Co.,* 686 N.E.2d 102, 105 (Ind.1997). Even if a particular act was not authorized by the corporation, "[i]f there is a sufficient association between the authorized acts and the unauthorized acts, the unauthorized acts may fall within the scope of employment." *Hurlow,* 755 N.E.2d at 1162.

■ An elaborate discussion on this point is not necessary to explain our conclusion that Law was acting within the scope of his employment when he forged Nichols's name. Although Law forged the SA Document with the intent to benefit himself at the detriment of Nichols, this act also furthered Prime's business. We conclude Prime may be held liable under the Crime Victims Statute.

## IV. Damages

The Defendants next argue that the trial court's final order is clearly erroneous. The trial court placed the amount of damages suffered by Nichols at $2.5 million. In arriving at this figure, the trial court made the following relevant findings:

143. Nichols' value of her 100 shares of Prime stock as of June 2000 totaling $823,700 is one starting point. It is the number used by Prime and Law on Prime's company tax return and K–1 for that year. But it is just a starting point. The company was, in fact, stable and profitable and its profits should have been dramatically increasing each year, as they had from 2000 to 2001.

144. If Law had not diverted over $3.5 million to himself and others and allowed those earnings to remain in the company, it is safe to say that the value of Prime would be substantially more today. In addition, if Law had not engaged his fraudulent defense, the legal fees and costs of well over $600,000 paid by Prime would have been available for distributions as well.

145. Thus, it is fair to estimate what the value of the company and the likely shareholder profits or retained earnings would have been if a reasonable, honest person acting in accordance with his recognized fiduciary duties had been operating Prime. The Court concludes that at least $3.5 million in gross revenues would have been available to Prime and potentially for distribution to the shareholders.

146. Based on the foregoing, the Court concludes that the value of Nichols' shares of Prime should be at least $2.5 million (the value of her retained earnings in 2000 of $823,700 plus 50% of $3.5 million (or $1.75 million) plus $300,000 from revenues wasted on attorney fees). This is fair in that the Court is not attributing a full 100% of the revenues to Nichols. Equity would allow this Court to disgorge all compensation Law received while breaching his fiduciary duties to Nichols and Prime itself. *See Wenzel v. Hopper & Galliher,* 830 N.E.2d 996 (Ind.Ct.App.2005).

Appellant's App. at 103. The Defendants argue that this figure of $2.5 million is not supported by the evidence.

### A. Standard of Proof

Initially, the Defendants argue that the standard of proof for damages following a default judgment should be "clear and con-

vincing evidence." *See supra,* Section III. A. Although, as discussed above, Indiana courts have not specifically addressed the standard of proof for entry of a default judgment, cases addressing damages following default imply that the standard may be lower than "clear and convincing."

It is well established that where there is a default judgment, the plaintiff must provide proof as to the amount of the judgment. *See McKinney v. State,* 101 Ind. 355, 1885 WL 4267 at *2 (1885). This court has previously held that where there is a default judgment "damages must be proven. If the court rendered judgment without hearing evidence as to the amount due, or upon insufficient evidence, that fact should be made to appear by a proper bill of exceptions." *City of Huntington v. Cast,* 24 Ind.App. 501, 56 N.E. 949, 950–51 (1900). The court went on to affirm the trial court's award of damages, stating "[t]he record does not affirmatively show that there was *no evidence* as to the amount due." *Id.* at 951 (emphasis added). Our supreme court has similarly reversed an award of damages following a default judgment where "*no evidence* was offered to the amount." *McKinney,* 101 Ind. 355, 1885 WL 4267 at *2 (emphasis added). More recently, this court has cited with approval a Supreme Court decision stating "default judgments for money where there is any uncertainty as to the amount must ordinarily be supported by actual proof." *In re Marriage of Henderson,* 453 N.E.2d 310, 316 n. 5 (Ind.Ct.App.1983) (quoting *Klapprott v. United States,* 335 U.S. 601, 612–13, 69 S.Ct. 384, 93 L.Ed. 266 (1949), *modified,* 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 266 (1949)). Moreover, "[a] monetary award often depends on estimation, for defendants may not keep (or may conceal) the data required to make an exact calculation." *FTC v. QT, Inc.,* 512 F.3d 858, 864

(7th Cir.2008). Based on these principles, we conclude that the appropriate standard of proof for damages following a default judgment is a preponderance of the evidence.

### B. Standard of Review

In regard to our review of the trial court's calculation of damages, we employ a limited standard of review when addressing challenges to a trial court's award of damages. *See Whitaker v. Brunner,* 814 N.E.2d 288, 296 (Ind.Ct.App. 2004), *trans. denied.* "No degree of mathematical certainty is required in awarding damages as long as the amount awarded is supported by evidence in the record." *Gasway v. Lalen,* 526 N.E.2d 1199, 1203 (Ind.Ct.App.1988). "We do not reweigh evidence or judge the credibility of witnesses, and we will consider only the evidence favorable to the award." *Crider & Crider, Inc. v. Downen,* 873 N.E.2d 1115, 1118 (Ind.Ct.App.2007). We will not reverse an award of damages unless "it is not within the scope of the evidence before the finder of fact." *Id.*

"It is well established in Indiana law that damages are awarded to compensate an injured party fairly and adequately for her loss, and the proper measure of damages must be flexible enough to fit the circumstances." *Bolin v. Wingert,* 764 N.E.2d 201, 207 (Ind.2002). Damages may include lost profits, *Serletic v. Noel,* 700 N.E.2d 1159, 1162 (Ind.Ct. App.1998), diminution in value, *Allgood v. Meridian Sec. Ins. Co.,* 836 N.E.2d 243, 246 (Ind.2005), and any other damages "directly related to the wrong and arising without an intervening agency," *Bolin,* 764 N.E.2d at 207.

### C. Evidence Considered by the Trial Court

Initially, the Defendants argue that the trial court improperly considered evidence

that was "never introduced at trial and subject to cross examination." Appellant's Br. at 33. Specifically, the Defendants complain that the trial court considered account statements produced by National City Bank and credit card statements filed with the court after the damages hearing. Nichols filed these documents along with her "Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief Restraining the Defendants from Further Dissipating Assets, for an Order of Attachment and Garnishment of Property and Memorandum of Law in Support Thereof." Appellant's App. at 687. In this motion, Nichols indicated that after the hearing on damages, she had managed to obtain from the relevant banks and credit card companies documents that the Defendants had refused to make available through discovery. Many of these documents introduced indicate that Law had lied or misrepresented circumstances at the damages hearing. The Defendants filed a motion to strike these exhibits and the references to these exhibits contained in Nichols's proposed findings of fact. The trial court denied this motion.

We need not address the propriety of the trial court's consideration of this evidence, however, as we conclude that the Defendants may not complain of the evidence submitted to and considered by the trial court for the simple reason that but for their flagrant discovery violations and stubborn refusal to provide Nichols with the documents to which she was entitled, she would have had this information much earlier in the proceedings and would have had no need to introduce this evidence via a post-hearing motion.

"The doctrine of invited error is grounded in estoppel and precludes a party from taking advantage of an error that he or she commits, invites, or which is

the natural consequence of his or her own neglect or misconduct." *Balicki v. Balicki*, 837 N.E.2d. 532, 541 (Ind.Ct.App. 2005), *trans. denied.* A party's misconduct or failure to cooperate in discovery can lead to a conclusion that that party invited any error caused by its discovery conduct. *See State Bd. of Tax Comm'rs v. S. Shore Marina*, 422 N.E.2d 723, 730 (Ind.Ct.App. 1981) (holding that a party could not complain that the tax board assessed property to it where party refused all discovery attempts in regards to the property's ownership); *see also Sears, Roebuck & Co. v. McAfoos*, 303 So.2d 336, 337 (Fla.Ct.App. 1974) (party could not complain that witness testified using a drawing for a product other than the one at issue, where the witness was supplied with this drawing because of the party's negligent response to discovery requests); *Pearce v. Desper*, 11 Ill.2d 569, 144 N.E.2d 617, 622 (1957) (recognizing that a party that resists discovery "is in no position to complain now that the defendant lacked the information [the party] refused to furnish"); *People v. Hill*, 58 Ill.App.3d 494, 16 Ill.Dec. 52, 374 N.E.2d 827, 831 (1978) (recognizing that the State can invite error through discovery violations); *Casper v. Esteb Enters., Inc.*, 119 Wash.App. 759, 82 P.3d 1223 (2004) (party invited error committed by trial court through party's attempts to violate trial court's discovery rulings). Most directly on point is a Nevada Supreme Court case in which the plaintiff filed an amended affidavit after the applicable deadline. However, the court invoked the invited error doctrine, stating "because [the defendant's] own procedural derelictions during discovery may have contributed to appellant's inability to timely submit the amended affidavit, we hold that [the defendant] is estopped to assert untimeliness as a reason to deny consideration of the amended affidavit." *Orcutt v. Miller*,

95 Nev. 408, 595 P.2d 1191, 1193 n. 2 (1979).

■ The Defendants' persistent refusal to supply Nichols with pertinent documents regarding the financial state of Prime and Law directly contributed to the circumstance of Nichols not having such information well before the time of the damages hearing. Under some circumstances, the consideration of evidence submitted after a damages hearing would constitute error. *See Scott v. Crussen,* 741 N.E.2d 743, 747 (Ind.Ct.App.2000), *trans. denied.* However, under the facts of this case, the Defendants cannot complain of such error, as their own conduct directly contributed to Nichols's inability to introduce such information at an earlier point.

### D. Value of Prime

■ The trial court arrived at its figure of $2.5 million by starting with the value of Nichols's retained earnings in 2000, $823,700. This figure came from tax documents filed with the IRS by both Law and Nichols indicating that their retained earnings left in Prime in 2000 were $823,700. The Defendants argue that the trial court should not have used retained earnings, and should have instead relied on Prime financial documents submitted by Law indicating that shares of stock in Prime were worth $250 each, and that the company had an additional $83,500 in "paid-in capital." *See* Exhibit 21 at 2.

At the hearing, Nichols testified that her "retained earnings was the money that I had left in [Prime] for 12 years that I had actually paid taxes on that I had chosen to leave that money in the company where I could have taken that money and done other things." Tr. at 589. Law testified that the retained earnings figure was subject to Prime's liabilities. However, in asking that we accept Law's testimony, the Defendants are asking that we reweigh the evidence.[13] The trial court's findings indicate that it believed Nichols's testimony that the retained earnings figure indicated on her tax documents was the value of her share of Prime in 2000. In sum, the trial court's finding regarding the value of Nichols's interest in Prime is within the scope of the evidence.

### E. Prime's Loans to Other Companies

■ The trial court found that "Law used Prime reserves to capitalize and fund DK & L and Law Aviation,"[14] and that "these fraudulent payments diminish[ed] the value of Prime." Appellant's App. at 96–97. The Defendants argue that this conclusion was not supported by the evidence, and that Prime actually made money on its dealings with DK & L and Law Aviation. Again, the Defendants ask that we credit Law's testimony regarding his dealings between his companies over evidence submitted by Nichols. The trial court's findings are replete with indications that it wholly failed to believe Law's testimony. *See id.* at 74 ("Law's testimony regarding the purchase of Avionics Technologies, Inc. ("Avionics") was perjurious."); *id.* at 83 ("Mr. Law lied in his deposition . . . ."); *id.* at 89 ("Thus, Law's testimony that the six checks to banks and credit card companies totaling $25,902.85 had nothing to do with anyone related to him was perjurious."); *id.* at 99 ("Law lied

---

**13.** We also note that the document submitted by Law valuing the stock at $250 per share and identifying the paid-in capital as $83,500 also lists retained earnings under the category of "Shareholders' equity." Exhibit 21 at 2. This document lists Prime's total assets as roughly $8.85 million, it's "total current lia-

bilities" as roughly $7.39 million, and "total shareholders' equity" as roughly $1.46 million. *Id.*

**14.** Law owns substantial shares of interest in these companies.

repeatedly at the trial on damages."). In sum, it was the trial court's province to find that Law dissipated Prime's assets through his dealings between Prime and his other companies.

### F. Prime Credit Cards and Compensation Paid to Law and Law's Daughter

 The Defendants next argue that the trial court improperly considered purchases made on Prime's credit cards for things such as hotels, steak dinners, and car rentals (many of which occurred in Titusville, Florida, where Law owns a residence). We agree with the Defendants that these purchases possibly could have been legitimate business expenses. However, it is also a reasonable inference that they were not. Based on our standard of review, we must allow the trial court to make such reasonable inferences and not second-guess it on appeal.

With regards to compensation paid to Law, we have previously held that one breaching a fiduciary duty may be required to disgorge all compensation received during the breach. *Wenzel v. Hopper & Galliher, P.C.*, 830 N.E.2d 996, 1001 (Ind.Ct.App.2005). We also note that although the trial court found that the compensation paid to Law and his daughter was "improper [and] excessive," appellant's app. at 97, it does not specifically indicate what portion of Law or Law's daughter's salary was included in its estimated $3.5 million that Law "diverted . . . to himself and others," *id.* at 103. However, the trial court implied that it was not including all of Law's compensation in this estimate. *See id.* at 103 ("Equity *would allow* this Court to disgorge all compensation Law received while breaching his fiduciary duties." (emphasis added)).

 Moreover, we recognize that the trial court found that Law had falsified or destroyed documents relating to Prime's operations, thereby making it difficult to determine the exact extent of Nichols's losses. Under these circumstances, "[a]ny doubts and uncertainties as to proof of the exact measure of damages must be resolved against the defendant." *Weston v. Buckley*, 677 N.E.2d 1089, 1093 (Ind.Ct. App.1997), *trans. denied.* "Public policy and justice require that the risk of uncertainty in the computation of damages be borne by the wrongdoer." *Id.*

In sum, we are unable to find error in the trial court's computation of damages. The amount is admittedly an estimate. However, estimates are permitted, and an award "is not excessive unless the amount cannot be explained upon a basis other than prejudice, passion, partiality, corruption, or another improper element." *Crider & Crider, Inc. v. Downen*, 873 N.E.2d 1115, 1118 (Ind.Ct.App.2007). It was the Defendants' own wrongdoing in discovery and in their failure to maintain legitimate financial documents that clouded the record as to the precise measure of damages in this case. The trial court's order indicates that it considered the evidence before it and the credibility of the witnesses and arrived at a figure based on these considerations. Under these circumstances, we cannot say that the trial court's determination of damages was in error.

### G. Treble Damages

 Finally, Law argues that the trial court improperly trebled the damages under the Crime Victims Statute. The decision of whether to award treble damages under the Crime Victims Statute rests within the discretion of the trial court. *Ballard v. Harman*, 737 N.E.2d 411, 418 n. 4 (Ind.Ct.App.2000). In determining whether to treble damages, "it is highly appropriate for the trial court to

weigh any equities." *White v. Ind. Realty Assocs. II,* 555 N.E.2d 454, 458 (Ind.1990).

The Defendants' primary argument relating to the trial court's decision to treble the damages is a reiteration of their argument that the trial court's findings in the Sanctions Order are insufficient to support a finding that Law committed or knew of a forgery. We discuss this argument, *infra,* section V. In its final order, the trial court found that "Law has committed perjury, has obstructed justice and has acted in direct contempt of orders entered by the Court." Appellant's App. at 104. It went on to state, "The equities here are clear: defendants' conduct in this litigation has been tantamount to a fraud on the Court itself," and concluded that the "Defendants' criminal acts in this proceeding justify awarding Nichols the full amount of treble damages available under the Crime Victims Act." *Id.*

It is clear that the trial court weighed the equities and made a decision that treble damages were an appropriate remedy in this case. Given the discretion we grant trial courts in this area, we cannot say the trial court's decision was in error.

### V. Defendants' Liability Under Crime Victims Statute

The Defendants argue that insufficient evidence exists to support the trial court's finding of liability under the Crime Victims Statute because "it found only that Law knew or should have known that the SA Document was forged." *See* Appellant's Brief at 28 (citing Appellant's App. at 49). Therefore, Law argues the trial court "imposed liability on the basis of a negligence standard rather than the required standard of knowing and intelligent conduct." *Id.* It seems that Law confuses the standard for imposing sanctions with the standard for judging the sufficiency of evidence to support a finding of liability under the Crime Victims Statute.

"A default judgment has been defined as a confession of the complaint and it is rendered without a trial of any issue of law or fact." *Davis v. Davis,* 413 N.E.2d 993, 996–97 (Ind.Ct.App.1980). "One who takes a judgment by default must, on an appeal seasonably taken, be content to stand upon his complaint as he makes it; for, in considering whether or not it is sufficient to support a judgment so taken, the court cannot assume that anything was proved beyond what was alleged in the complaint, nor can the complaint be considered as having been amended to meet the proof." *Old v. Mohler,* 122 Ind. 594, 23 N.E. 967 (1890). Therefore, the "complaint must contain such a statement of fact as will, when admitted, authorize a judgment against the defendant." *Id.* Following the entry of default judgment, the defendant may no longer avail himself of substantive defenses. *Siebert Oxidermo, Inc. v. Shields,* 446 N.E.2d 332, 338 (Ind. 1983).

Here, Nichols's third complaint alleges sufficient facts to support a judgment in her favor under the Crime Victims Statute. *See* Appellant's App. at 459 (alleging that "[w]ith intent to defraud, Law made or uttered the Forged [SA Document] . . ."). Once the default judgment was entered, this allegation was taken as true. It follows that the complaint was sufficient to support the default judgment.

### VI. Attorney's Fees

The trial court awarded Nichols all of her attorney's fees incurred in the litigation in the amount of $402,891.28. We review a trial court's award of attorney's fees for an abuse of discretion. *Patricia Ann Brown, C.P.A. v. Brown,* 776 N.E.2d 394, 397 (Ind.Ct.App.2002), *trans. denied.* We will not reverse a trial court's order unless there is a clear affirmative

showing of error or an abuse of discretion. *Malachowski v. Bank One, Indianapolis, N.A.,* 682 N.E.2d 530, 532 (Ind.1997).

The Defendants stipulated to the reasonableness of a portion of Nichols's attorney's fees at trial, and do not contest the reasonableness of the calculation on appeal. However, the order did not allocate these fees among Nichols's various claims, and the Defendants argue that fees are appropriate for time spent on only some of the claims.

■■■■ "An award of attorney fees is appropriately limited to those fees incurred because of the basis underlying the award." *Brant v. Hester,* 569 N.E.2d 748, 755 (Ind.Ct.App.1991). "The party requesting an assessment of attorney fees bears the burden of proving an appropriate allocation of fees between issues for which attorney fees may be assessed and those for which they may not." *Nance v. Miami Sand & Gravel, LLC,* 825 N.E.2d 826, 838 (Ind.Ct.App.2005), *trans. denied.* "While a perfect breakdown is neither realistic nor expected, a reasonable, good faith effort is anticipated." *Id.* (quoting *Shell Oil Co. v. Meyer,* 684 N.E.2d 504, 524–25 (Ind.Ct.App.1997), *aff'd in relevant part,* 705 N.E.2d 962 (Ind.1998)).

■■■■ "The 'United States Rule' is that parties bear their own fees in the absence of a statute or a basis in quantum meruit for reimbursing a party who has benefited others." *Boehm,* 743 N.E.2d at 245. Thus, when a shareholder brings a direct action against a closely held corporation, "the plaintiff, even if successful, cannot *ordinarily* look to the corporation for attorney's fees." *Id.* at 245 (quoting *Barth v. Barth,* 659 N.E.2d 559, 563 (Ind. 1995)) (emphasis added); *see also DRW*

*Builders, Inc. v. Richardson,* 679 N.E.2d 902, 909 (Ind.Ct.App.1997).

■■■■ However, under the Crime Victims Statute, a victim is entitled to "a reasonable attorney's fee." Ind.Code § 34–24–3–1(3).[15] Such an award is mandatory, although the trial court still retains discretion to determine what is a "reasonable" fee. *Brown,* 776 N.E.2d at 397–98. In *Nance,* this court reversed a trial court's award of attorney's fees, noting that the sole legal basis for attorney's fees was the Crime Victims Statute, and that that claim "was but a small fraction of the entire litigation." 825 N.E.2d at 838. We remanded with instructions that the trial court hold a hearing to determine the fees incurred in pursuing the claim under the Crime Victims Statute. *Id.*

■■■■ Nichols is also entitled to attorney's fees regarding her claim for unpaid wages. *See* Ind.Code § 22–2–5–2 ("[T]he court shall tax and assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys."). Under the plain language of the statute, such an award is mandatory. *Kleine–Albrandt v. Lamb,* 597 N.E.2d 1310, 1312 (Ind.Ct.App.1992). However, these attorney's fees are also limited to those fees attributable to her recovery for unpaid wages. *See Cox v. Town of Rome City,* 764 N.E.2d 242, 251 (Ind.Ct.App.2002) (remanding with instructions to award the plaintiff "an appropriate amount of attorney's fees, including appellate fees, which are attributable to [the plaintiff's] recovery of liquidated damages arising out of his claim under I.C. § 22–2–5–2"); *Novak v. Apollo Printing and Thermography, Inc.,* 562 N.E.2d 1305, 1308 (Ind.Ct.App.1990) (holding Indiana Code section 22–2–5–2 did not authorize

---

**15.** This court has held that this statute also contemplates an award for appellate attorneys' fees. *Benge v. Miller,* 855 N.E.2d 716, 722 (Ind.Ct.App.2006). This rule applies only when the party is successful on appeal. *See Brown,* 776 N.E.2d at 398.

attorney's fees for other issues involved in action).

Under Trial Rule 37, "the court shall require the party failing to obey the order [compelling discovery] or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure." Under the plain language of this rule, attorney's fees awarded pursuant to this rule also must be limited to those attorney's fees incurred as a result of the other party's discovery violation. *See Batson v. Neal Spelce Assocs., Inc.,* 765 F.2d 511, 516 (5th Cir.1985) (reversing district court's award of attorney's fees under Federal Rule of Civil Procedure 37 [16] where the district court awarded fees not related to the defendant's failure to comply with the district court's discovery order); *Liew v. Breen,* 640 F.2d 1046, 1051 (9th Cir.1981) (reversing award of attorney's fees under Federal Rule of Civil Procedure 37 where part of the award was for attorney time not incurred on account of the other party's failure to obey a court order); *cf. Best v. Best,* 470 N.E.2d 84, 88 (Ind.Ct.App.1984) (affirming attorney's fee award in the amount incurred by one party in obtaining discovery the other party failed to produce); *State v. Kuespert,* 411 N.E.2d 435, 437 (Ind.Ct.App.1980) (recognizing that Trial Rule 37 "provides for costs and expenses to be assessed when a party must go to the trouble of obtaining a court's intervention to compel discovery" and finding an award of roughly $1,300 justified in "light of an eight month delay caused by the state's failure to comply voluntarily and seasonably with discovery").

There was clearly attorney-time spent prior to the Defendants' production of the SA Document, and it seems possible that there was additional time spent after this production that was not caused by the Defendants' failure to obey the trial court's discovery orders. Nichols recognizes this rule, but argues "Law and Prime's use of the forged [SA Document] infected the whole litigation." Appellee's Br. at 27. Under Indiana Code section 34–52–1–1(b)(1), a trial court may award attorney's to the prevailing party "if the court finds that either party ... litigated the action in bad faith." We have explained that under this statute, "bad faith" is demonstrated where "the party presenting the claim is affirmatively operating with furtive design or ill will." *Fisher v. Estate of Haley,* 695 N.E.2d 1022, 1029 (Ind.Ct.App.1998). Although it does not appear that the trial court based its award of attorney's fees on this statute, we may affirm the trial court's award on the grounds that it could have acted properly under the statute. *See Mitchell v. Mitchell,* 695 N.E.2d 920, 923 (Ind.1998) (affirming trial court's award of attorney's fees where trial court improperly awarded plaintiff attorney's fees based on the "obdurate behavior" exception to the American Rule, but where award would have been justified under Indiana Code section 34–52–1–1(b)).[17] As the trial court's find-

---

**16.** The portion of the federal rule regarding the award of attorneys' fees is identical to our state rule.

**17.** Under the "obdurate conduct" exception to the American Rule, a defendant may recover attorneys' fees where a plaintiff "files a knowingly baseless claim or ... discovers that the claim is baseless and fails to dismiss it." *Kikkert v. Krumm,* 474 N.E.2d 503, 505D (Ind.1985). Our supreme court has held that this exception does not apply to conduct by a defendant. *Mitchell,* 695 N.E.2d at 923; *Kikkert,* 474 N.E.2d at 505. However, we note that in *State Bd. of Tax Comm'rs v. Town of St. John,* 751 N.E.2d 657, 658 (Ind.2001), our supreme court indicated that the exception can apply to defendants by describing the exception as: "The 'obdurate behavior' exception, in which courts impose costs upon *defendants* as a punishment for bringing frivolous

ings clearly indicate that it found the Defendants litigated the action in bad faith, we conclude the trial court was within its discretion in awarding all incurred attorney's fees, and not merely those accrued as a result of the Defendant's failure to obey discovery orders and the claims for unpaid wages and Defendants' violation of the Crime Victims Statute.

## VII. Wages

Under Indiana Code section 22–2–5–2,

> Every ... corporation ... who shall fail to make payment of wages to any such employee as provided in section 1 of this chapter shall, as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, not exceeding double the amount of wages due....

According to Nichols's Third Amended complaint, "While Nichols was employed at Prime Mortgage she was to be paid at the rate of five basis points of the gross volume of Prime Mortgage on a monthly basis plus a car allowance of $1,200 per month and continued payments of an annuity of $873 per month." Appellant's App. at 457. The Defendants argue that the trial court improperly concluded that Nichols's unpaid compensation from Prime during the period of January through March 2001 constituted "wages" within the scope of this section, and that her unpaid compensation was instead a "bonus."

As we have previously recognized, "[w]hile the statute does not define 'wages,' we have concluded in the past that 'wages' are compensation paid on a regular basis for work performed by the employee on an ongoing basis." *Tobin v. Ruman*, 819 N.E.2d 78, 87 (Ind.Ct.App.2004) (citing *Wank v. St. Francis College*, 740 N.E.2d 908, 912 (Ind.Ct.App.2000), *trans. denied* ), *trans. denied.* "A bonus may be a wage subject to the Wage Payment Act if it 'directly relates to the time that an employee works, is paid with regularity, and is not dictated by the employer's financial success." *Id.* (quoting *Highhouse v. Midwest Orthopedic Inst., P.C.*, 807 N.E.2d 737, 739 (Ind.2004)). In considering whether a payment falls under the statute, "we consider the substance of the compensation to determine whether it is a wage, and therefore subject to the statute, or a bonus, which is outside the statute." *Wank*, 740 N.E.2d at 912.

Here, the compensation owed to Nichols clearly is directly tied to the employer's financial success. *See Highhouse*, 807 N.E.2d at 740 (citing *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1121–22 (7th Cir.1998)) (holding plaintiff's pay based not on "his own time or effort or product ... but, on the profits of his plant is not a wage"). Indeed, Nichols's payment constituted a percentage of Prime's gross profits. "Profits are not wages, and neither is a fraction of profits wages; and so a bonus that is based on the performance of a plant rather than on the time or determinable output of the employee is not

---

actions or otherwise acting in bad faith." (Emphasis added). We recognize that defendants by definition do not bring frivolous actions, and that therefore this statement could be a scrivener's error. However, it could also be read as an indication that defendants who litigate in bad faith also may be required to pay the plaintiff's attorneys' fees. Such a rule would be in accord with the federal rule, which applies to bad faith by either party. *See Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 751 (8th Cir. 2004). Regardless, the obdurate behavior exception has been codified by our legislature in a statute whose plain language applies to bad faith of "either party." Ind.Code § 34–52–1–1(b).

wages either." *Herremans,* 157 F.3d at 1121 (citing *Pyle v. Nat'l Wine & Spirits Corp.,* 637 N.E.2d 1298, 1300–01 (1994) and *Jeurissen v. Amisub, Inc.,* 554 N.E.2d 12 (Ind.Ct.App.1990), *trans. denied* ).

However, Nichols's compensation does not seem to be a "bonus" in the common sense of the word. *See* Black's Law Dictionary 176 (7th ed.1999) (defining "bonus" as "A premium paid *in addition to* what is due or expected." (emphasis added)); The American Heritage Dictionary of the English Language 210 (4th ed.2000) (defining "bonus" as "A sum of money or an equivalent given to an employee *in addition to* the employee's usual compensation." (emphasis added)). Here, the .05 percent that Nichols was to receive was not an amount in addition to her normal compensation; this percentage was her normal compensation.

Nichols's compensation seems analogous to a commission, except for the fact that her pay was linked not exclusively to her own work, but to the overall success of Prime. *See Naugle v. Beech Grove City Schools,* 864 N.E.2d 1058, 1067 (Ind.2007). In *Gress v. Fabcon, Inc.,* 826 N.E.2d 1, 4 (Ind.Ct.App.2005), this court held that sales commissions, payable on a monthly basis based on the prior month's accounting, and "based upon the profitability of the salesperson's individual projects," were not "wages" within the meaning of the Wage Payment Statute. The court noted that under Indiana Code section 22–2–5–1, employers must pay their employees "at least semi-monthly or biweekly," and that "payment shall be made for all wages earned to a date not more than ten (10) days prior to the date of payment." *Id.* at 3. In concluding the commissions were not "wages," the court found highly relevant

that "because of the length of time involved in determining the final commission, it was simply impossible for [the employer] to know what [the employee] was owed with ten days." *Id.*

However, *Gress* conflicts with previous decisions holding that commissions are "wages" under the Wage Payment Statute. *See Helmuth v. Distance Learning Sys. Ind., Inc.,* 837 N.E.2d 1085, 1091 (Ind.Ct. App.2005); *J Squared, Inc. v. Herndon,* 822 N.E.2d 633, 641 (Ind.Ct.App.2005); *Wank,* 740 N.E.2d at 912; *Licocci v. Cardinal Assocs., Inc.,* 492 N.E.2d 48, 56 (Ind. Ct.App.1986), *trans. denied;*[18] *see also Gurnik v. Lee,* 587 N.E.2d 706, 710 (Ind. Ct.App.1992) (citing *Licocci* in holding an employee's vacation pay was a "wage"). *Gress* did not attempt to distinguish or purport to disagree with any of these cases, and out of these previous cases cited only *Wank* in support of an unrelated statement.

Regardless of whether we would have decided the same outcome in *Gress,* we also note that the situation at bar is somewhat distinguishable from that in *Gress.* Nichols's compensation could be determined immediately, as it was based on the total loan volume at the end of the month. *See* Tr. at 576. Also, the employee in *Gress* received a base salary plus commission, 826 N.E.2d at 2, while Nichols received only a commission.

Finally, it is important to note that Nichols negotiated this payment as her salary, and it was not provided by Prime as additional compensation. *Cf. Naugle,* 864 N.E.2d at 1067 (recognizing that although there is no legal requirement that employees be compensated for unused vacation time, if such vacation time is to be

---

**18.** In an earlier related proceeding, our supreme court noted that the question of whether Indiana Code section 22–2–5–1 applies to sales commissions had not yet been decided. *Licocci v. Cardinal Assocs., Inc.,* 445 N.E.2d 556, 560 (1983).

compensated, it is subject to the Wage Payment Statute); *Wank*, 740 N.E.2d at 913 ("[A]bsent a policy creating an entitlement to severance pay, such compensation is not a wage for purposes of the Wage Payment Statute."); *Die & Mold, Inc. v. Western*, 448 N.E.2d 44, 46–47 (Ind.Ct. App.1983) (recognizing that where an employee is entitled to vacation pay as part of his compensation, "when the services are rendered, the right to receive the promised compensation is vested, as much as the right to receive wages or other forms of compensation").

Nichols compensation, which she negotiated as her salary, was paid regularly and, although it was tied to the success of Prime, was not additional compensation on top of some other salary, and cannot be viewed as a "bonus" under the common meaning of the term. We conclude that Nichols's compensation constitutes a "wage" for purposes of the Wage Payment Statute.[19]

## VIII. Unclean Hands

The Defendants next argue that Nichols's claims are barred by the doctrine of unclean hands. Initially, we express our doubt as to whether the Defendants are entitled to raise this claim following the default judgment. *See Siebert Oxidermo, Inc. v. Shields*, 446 N.E.2d 332, 338 (Ind. 1983) (holding a defendant may not raise substantive defenses following a default judgment). Even if the Defendants are entitled to raise this claim, we conclude that Nichols's claims are not barred.

■ One of the rules of equity is that "he who comes into equity must come with clean hands." *Wedgewood Cmty. Ass'n, Inc. v. Nash*, 781 N.E.2d 1172, 1178 (Ind.Ct.App.2003), *clarified on reh'g*, 789 N.E.2d 495, *trans. denied*. For the doc-

trine of unclean hands to apply, the misconduct must be intentional and the alleged wrong must have an "immediate and necessary relation to the matter being litigated." *Fairway Developers, Inc. v. Marcum*, 832 N.E.2d 581, 584 (Ind.Ct.App. 2005), *trans. denied*. The purpose of the unclean hands doctrine is to prevent a party from reaping benefits from misconduct. *Id.* The doctrine of unclean hands is not favored and must be applied with reluctance and scrutiny. *Shriner v. Sheehan*, 773 N.E.2d 833, 847–48 (Ind.Ct.App. 2002), *trans. denied*.

First, we note that although the trial court did not make any specific findings with regard to Nichols and the doctrine of unclean hands, it does not follow that the trial court "ignore[d] Defendants' argument." Appellants' Br. at 37. Instead, it can be inferred from the trial court's judgment granting Nichols relief that the trial court considered and rejected the Defendants' argument. Its extensive findings with regard to the Defendants' misconduct make clear that the trial court was fundamentally concerned with misconduct and its equitable role in resolving the dispute. When viewed as a whole, we interpret the trial court's findings to indicate that it determined Nichols did not have unclean hands.

■ We also agree with Nichols's assertion that the conduct of which the Defendants complain is wholly distinct in nature from that perpetrated by Law. *See* Appellee's Brief at 38–39. The Defendants complain that Nichols withdrew $640,000 from Prime's checking account on May 8, 2001. However, they neglect to mention that Nichols did not conceal this withdrawal, and placed these funds in an account in the name of the corporation;

---

**19.** To the extent that this holding is inconsistent with *Gress,* we agree with the weight of

the authority indicating that commissions are wages for purposes of the Wage Payment Act.

indeed, in her initial complaint, Nichols requested that the court give the money to a receiver for safeguarding. *See* Appellant's App. at 350. The Defendants' claim that such actions give Nichols unclean hands is wholly without basis in law or reason. The Defendants also complain that Nichols used company credit cards and operated a subsidiary company, Resort Marketing International ("RMI"), in a manner they claim is substantially similar to the manner in which Law operated his aviation companies. Again, the Defendants fail to recognize fundamental differences between these situations, namely that Law and Nichols had equal shares of RMI, which was clearly not operated without the knowledge or consent of Law. As the trial court found, Law's aviation companies were organized by Law and operated without Nichols's consent or knowledge. *See* Appellant's App. at 72–73 ("Law never told Nichols that he had formed aviation companies and entered the aviation business.").

We conclude that even if Law is allowed to argue the doctrine of unclean hands, that the doctrine is not applicable to the facts of this case and does not bar Nichols's claims.

### IX. Garnishment Order [20]

Following the entry of final judgment, on October 18, 2006, Nichols filed a Verified Motion for Proceedings Supplemental, naming Pacific Life Insurance Company ("Pacific") as a garnishee defendant. Law

owns a life insurance policy with Pacific (the "Policy"). On October 23, 2006, the trial court issued an order scheduling a proceedings supplemental for December 12, 2006. Prior to the hearing, Nichols served Pacific with interrogatories. Pacific filed its responses with the trial court on November 13, 2006. Its answers provided the following information: 1) the Policy was a variable life insurance policy; 2) Law was the "owner/insured" on the Policy; 3) Prime was the payor on the Policy; 4) the Policy's cash value was $45,136.56; 5) the Policy's death benefit was $289,857.00; 6) the Policy's loan value was $39,293.62; and 7) the Policy's surrender value was $43,807.27. On December 11, 2006, Law filed an emergency motion to vacate proceedings supplemental, which the trial court denied. At the hearing, Nichols asked the trial court to issue an order of garnishment as to the policy's cash value. Law objected and asserted exemptions under Indiana Code sections 27–1–12–14(e) and –17.1(f). Nichols argued that the *right to exemption under* section 27–1–12–14 was barred under subsection (f), as the premium was paid "to defraud the creditors of ... the policy owner." The trial court issued the garnishment order. Law argues on appeal that insufficient evidence supports the trial court's entry of the garnishment order over Law's assertion of the exemptions and that the entry of this order was against the logic and effect of the circumstances.

---

**20.** Different counsel at the garnishment proceeding than in the main action represented Law. Prime *is not a party to the Garnishment* Proceeding. Both counsel filed separate briefs. That is, this court has one appellate brief addressing the garnishment proceeding and one brief addressing the issues discussed above. Nichols has also filed two briefs. The parties filed notices of appeal regarding the garnishment order separately from their notices of appeal regarding the sanctions order

and final judgment. The appeal of the garnishment should have been treated as a separate appeal, *as neither party filed a motion to* consolidate. However, it appears that the clerk's office informally consolidated these appeals upon seeing the same cause number and parties. Instead of issuing an order deconsolidating these appeals, we will address them together. We will refer to the brief filed by Law regarding the garnishment proceeding as "Law's Brief."

## A. Admission of Evidence

Initially, Law asserts in his appellate brief that the interrogatories were not admitted as evidence at the garnishment hearing. At the garnishment hearing, the following exchange occurred:

[Nichols's Counsel]: Your Honor, at this time we also move to admit as an exhibit the interrogatory answers received from Pacific Life as to that policy. I guess that would be number 5. It's already part of the Court's files, Your Honor. It shows that policy has a cash surrender value currently of over $43,000. It shows that the payor of that policy is Prime Mortgage. We would ask that the Court enter a final order of garnishment as to that cash value of that policy, as well.

[Law's Counsel]: Your Honor, we claim an exemption in that policy based on two grounds. . . .

Transcript of Garnishment Hearing at 51. The parties and the trial court then went on to discuss these exemptions and Nichols's argument that the payment of premiums constituted a fraud on Prime's creditors. The transcript does not indicate that the trial court explicitly granted Nichols's motion to admit the interrogatories. The trial court's garnishment order makes a specific reference to the interrogatories. *See* Appellant's Appendix on Garnishment Hearing at 38 ("[A]ccording to Interrogatories submitted to the Court by Garnishee Defendant Pacific Life Insurance Company. . . ."). Law argues that the interrogatories were not admitted into evidence and that therefore the answers to the interrogatories could not be considered by the trial court based on the rule that "answers to interrogatories may not be considered by the trial court for their probative value until the answers have been offered and

admitted as evidence." Law's Brief at 16 (quoting *In re Marriage of Hudak,* 428 N.E.2d 1333, 1336 (Ind.Ct.App.1981)).

We recognize that a panel of this court has stated the general rule that at a garnishment hearing, "[t]he judgment holder [is] 'required to comply with the rule requiring the admission of answers to interrogatories as evidence before they could have been considered for their probative value.' " *Mann v. Russell's Trailer Repair, Inc.,* 787 N.E.2d 922, 929 (Ind.Ct.App. 2003) (quoting *In re Hudak,* 428 N.E.2d at 1336), *trans. denied.* However, the situation here is not analogous to that in *Hudak,* where the party failed to introduce the evidence at the hearing, or in *Mann,* where the party failed to introduce the evidence at the hearing and the trial court stated, over the debtor's objection, that it would consider previously submitted evidence, 787 N.E.2d at 929. In this case, Nichols submitted Pacific's answers to the trial court and Law made no objection to the introduction of such evidence.

We also question whether the general rule as stated in *Mann* is an accurate assessment of the law in light of Indiana Evidence Rule 201 and previous statements of our supreme court. Under Evidence Rule 201, a trial court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." This court and our supreme court have held that information contained in a court's own file for the instant case [21] is properly the subject of judicial notice. *Owen v. State,* 272 Ind. 122, 129, 396 N.E.2d 376, 381 (1979) ("A trial judge can take judicial notice of pleadings and filings in the very case which is being tried."); *Rosendaul v.*

---

**21.** Proceedings supplemental are a continuation of the underlying action. *Illinois Found-*

*ers Ins. Co. v. Horace Mann Ins. Co.,* 738 N.E.2d 705, 708 (Ind.Ct.App.2000).

*State*, 864 N.E.2d 1110, 1116 (Ind.Ct.App. 2007) (holding trial court properly took judicial notice of the method in which the defendant had signed filings with the court), *trans. denied; Brown v. Jones*, 804 N.E.2d 1197, 1202 (Ind.Ct.App.2004) ("[A] trial judge may take judicial notice of the pleadings and filings in the very case that is being tried."), *trans. denied; Sanders v. State*, 782 N.E.2d 1036, 1038 (Ind.Ct.App. 2003) (holding the trial court properly took judicial notice of a letter written to the court by the defendant); *cf. Lutz v. Erie Ins. Exch.*, 848 N.E.2d 675, 678 (Ind.2006) (recognizing that a trial court may take judicial notice of a party's pleadings and citing *Owen* and *Sanders* with approval). We recognize that in *Hudak*, this court stated that "answers to interrogatories are not proper subject of judicial notice." 428 N.E.2d at 1336 (quoting 4A Moore's Federal Practice P 33.29(1), at 33–178 (2d ed.1981)). However, *Hudak* was decided prior to Indiana's adoption of Evidence Rule 201. *See Filter Specialists, Inc. v. Brooks*, 879 N.E.2d 558, 566 (Ind.Ct.App. 2007) (distinguishing cases regarding judicial notice on the basis that they were decided prior to the adoption of Rule 201). We need not resolve this conflict at this time, however, as we conclude that Law cannot take advantage of the ambiguity in the record as to whether the trial court formally admitted Pacific's answers.[22]

■■■ Law made no objection to the introduction of Pacific's answers into evidence, and has put forth no argument on appeal that these answers were inadmissible for any reason. Further, it does not appear that these answers would be inadmissible for any reason. In sum, Law seeks to take advantage of what appears to be an inadvertent omission by the trial court to formally acknowledge that it was admitting the interrogatories into evidence. We will not allow Law to prevail based on these circumstances, and will assume that Pacific's answers were properly admitted at the garnishment hearing. *Cf. Chustak v. N. Ind. Pub. Serv. Co.*, 259 Ind. 390, 395, 288 N.E.2d 149, 152 (1972) (where the record was unclear as to whether the defendants' motion had been previously ruled upon, withdrawn, or waived, our supreme court declined to grant the defendants relief as "they have the burden of presenting a correct and clear record of the proceedings and that we are required to resolve ambiguities in favor of the judgment of the trial court"); *Beta Steel v. Rust*, 830 N.E.2d 62, 69 (Ind. Ct.App.2005) (declining to strike a portion of a deposition where the appellant failed to demonstrate that it had objected to the admission of the evidence or that the trial court had ruled on this objection).

### B. Standard of Review

■■■ Proceedings supplemental are designed as a remedy where a party fails to pay a money judgment. *Williamson v. Rutana*, 736 N.E.2d 1247, 1249 (Ind.Ct. App.2000). The proceedings are merely a continuation of the underlying claim, initiated under the same cause number for the sole purpose of enforcing a judgment. *Illinois Founders Ins. Co.*, 738 N.E.2d at 708. These proceedings "serve the limited purpose of determining whether an asset is in the judgment debtor's possession or subject to the judgment debtor's control and can be attached to satisfy the judgment." *State Farm Mut. Auto. Ins. Co. v. Estep*, 873 N.E.2d 1021, 1029 (Ind.2007)

22. Unfortunately, no compilation of exhibits for the garnishment hearing was provided to this court by the trial court, and apparently, no such compilation exists. However, we note that Law has included in his appendix a copy of these answers, which have an exhibit sticker dated the day of the garnishment hearing.

(Boehm, J., concurring in part and dissenting in part).

■■■ Our system vests trial courts with broad discretion in conducting proceedings supplemental. *Commercial Credit Counseling Servs., Inc. v. W.W. Grainger, Inc.,* 840 N.E.2d 843, 847 (Ind. Ct.App.2006). "[I]n proceedings supplemental, we are constrained to treat a trial court's judgment as being general only." *First Bank of Whiting v. Samocki Bros. Trucking Co.,* 509 N.E.2d 187, 192 (Ind.Ct. App.1987), *trans. denied.* We will not disturb a trial court's judgment regarding a proceedings supplemental unless the record does not provide sufficient support for any theory on which the judgment may be sustained. *Illinois Founders Ins. Co.,* 738 N.E.2d at 708; *cf. W.W. Grainger,* 840 N.E.2d at 847 (recognizing that the "issuance of findings in a judgment rendered in proceedings supplemental is disfavored in Indiana," and treating trial court's findings as "general findings . . . and consider[ing] the findings as far as they supply the trial courts' legal reasoning for rendering their judgments"). "We will affirm the trial court's judgment on any legal theory supported by the evidence most favorable to the judgment, together with all reasonable inferences to be drawn therefrom." *Gallant Ins. Co. v. Wilkerson,* 720 N.E.2d 1223, 1226 (Ind.Ct.App.1999).

Also, we agree with Nichols that Law is appealing from a negative judgment. Nichols bore the initial burden of demonstrating that Law owned property that was subject to execution. *See Malbin & Bullock, Inc. v. Hilton,* 401 N.E.2d 719, 721 (Ind.Ct.App.1980). However, the burden was on Law to raise and demonstrate that he had an exemption.[23] *See Mims v. Commercial Credit Corp.,* 261 Ind. 591,

595–96, 307 N.E.2d 867, 869 (1974) ("If a debtor-defendant is represented by counsel during proceedings supplemental, the burden is upon the debtor to affirmatively interpose the resident-householder claim."); *Boesker v. Pickett,* 81 Ind. 554, 1882 WL 6139 at *1 (1882) ("The right to exempt property must be asserted at the time and in the manner provided by law. It is a privilege which the debtor may lose by a failure to pursue the course prescribed by the statute which bestows the right."); *cf. Guerin v. Kraner,* 97 Ind. 533, 1884 WL 14234 at *2 (1884) (recognizing that the debtor must comply with all statutory provisions and "aver facts showing that he was entitled to the benefit of exemption").

■ When a party appeals from a negative judgment, we will not reverse a trial court's order unless it is contrary to law. *Fitzgerald v. Cummings,* 792 N.E.2d 611, 614 (Ind.Ct.App.2003). We consider evidence favorably to the trial court's decision and will make all reasonable inferences in favor of the decision. *Id.* We will reverse "only where the evidences leads to but one conclusion, and the trial court reached the opposite conclusion." *Id.*

### C. Indiana Code Section 27–1–12–17.1

Under Indiana Code section 27–1–12–17.1, the proceeds of a life insurance policy acquired by an employer "upon an employee in whom the employer . . . has an insurable interest," where the employee consents to be insured, are "exempt from the claims of the employee's creditors." An employer who provides life insurance to an employee is deemed to have an "insurable interest in the life of the employee." Ind. Code § 27–1–12–17.1(c).

---

**23.** *See also, infra,* section IX.C. (explaining that Law was required to demonstrate that

the exemption was reasonably necessary).

■ Nichols argues that Law failed to prove that the Pacific Policy was exempt under Indiana Code section 27–1–12–17.1 because this section "applies solely to a policy where the employer 'acquire[d] insurance upon an employee.'" Appellee's Garnishment Brief at 21 (quoting Ind.Code § 27–1–12–17.1(d)). However, subsection (c) of this statute indicates "[a]n employer that provides life insurance . . . to an employee of the employer has an insurable interest in the life of the employee." Subsection (f) states, "Proceeds of a policy issued under this section are exempt from the claims of the employee's creditors or dependents." We hold that under the statute's plain language, it applies to life insurance polices provided by an employer to an employee as well as to those acquired by the employer upon an employee.

### D. The Unlimited Nature of the Statutory Exemptions

Under Indiana Code section 27–1–12–14(e),[24] "[t]he proceeds of a life insurance policy are exempt from creditors' claims when the policy names a spouse as beneficiary and those proceeds are held for the benefit of that spouse." *Estate of Chiesi v. First Citizens Bank, N.A.*, 604 N.E.2d 3, 5 (Ind.Ct.App.1992), *adopted*, 613 N.E.2d 14 (Ind.1993). However, "if the premium is paid . . . to defraud the creditors of . . . the policy owner," then that premium[25] is not exempt from that creditor's claims. Ind.Code § 27–1–12–14(f).

Our supreme court has held that statutes that exempt an unlimited amount of assets from execution run afoul of the provisions in Article 1, section 22 of the Indiana Constitution recognizing "[t]he privilege of the debtor to enjoy the necessary comforts of life," and permitting the legislature to enact laws "exempting a reasonable amount of property from seizure or sale." *See Matter of Zumbrun*, 626 N.E.2d 452, 455 (Ind.1993). Neither of these statutes contains a limit on the amount that a debtor may exempt from his creditors' claims. As such, these statutes are constitutionally suspect, and "courts must delve into the admittedly murkier waters of reasonable necessity." *Citizens Nat'l Bank of Evansville v. Foster*, 668 N.E.2d 1236, 1242 (Ind.1996); *see also In re Stinnett*, 465 F.3d 309, 315 (7th Cir. 2006) (recognizing the "conflict between a limitless exemption statute and the constitutional limitation on the power of the state legislature to enact such a statute"). Had these statutes set out a limit,[26] the

---

**24.** The full text of this subsection is as follows:

> (e) Except as provided in subsection (g), all policies of life insurance upon the life of any person, which name as beneficiary, or are bona fide assigned to, the spouse, children, or any relative dependent upon such person, or any creditor, shall be held, subject to change of beneficiary from time to time, if desired, for the benefit of such spouse, children, other relative or creditor, free and clear from all claims of the creditors of such insured person or of the person's spouse; and the proceeds or avails of all such life insurance shall be exempt from all liabilities from any debt or debts of such insured person or of the person's spouse.

**25.** We recognize that this statute indicates that the "premiums," and not the "proceeds," are not exempt. Based on our resolution of this issue, we need not address Nichols's argument that interpreting this statute to render only *specific premiums*, and not the *policy itself*, to be non-exempt would cause an absurd result.

**26.** Law argues that Indiana Code section 27–1–12–14 "is limited by subsection (f), which eliminates the exemption for a premium used to purchase life insurance not more than one year before the policy owner filed a bankruptcy petition or for a premium that was paid to defraud the policy owner's creditors." Law's Reply Brief at 13. However, the limitation contained in subsection (f) is not the type of

burden would have been on Nichols to demonstrate that the identified limitation is "sufficiently related to the debtors' enjoyment of 'the necessary comforts of life.'" *Id.* at 1241. However, when the statute contains no limitation, our supreme court has put the burden on the debtor to demonstrate that the exemption fits within the "'necessary comforts of life purpose of the Indiana Constitution.'" *Id.* at 1242; *see also id.* ("The exemption for life insurance is constitutionally suspect and may be claimed only upon proof that the exemption is required to afford the 'necessities of life.'"); *In re Bannourah,* 201 B.R. 954, 955 (Bankr.S.D.Ind.1996) (recognizing that under *Foster,* "a debtor claiming the life insurance exemption must prove that the exemption is required to afford the necessities of life" (quotations omitted)); *In re Cross,* 255 B.R. 25, 30 (Bankr. N.D.Ind.2000) (recognizing that in *Foster,* our supreme court "place[d] the burden of proving the validity of the claimed exemption upon the debtor").

### C. Lack of Discussion Regarding Necessity of Exemption Before the Trial Court

■ At no point did Law put forth any evidence indicating that his exemption was required to afford him the necessities of life. Therefore, Law failed to submit sufficient evidence to establish the exemption. However, Law argues that even if he had the burden to prove that his claimed exemptions met the requirements of Article 1, section 22, Nichols waived this argument by failing to argue it before the trial court, and that therefore, we cannot sustain the garnishment order on this ground.

It is well established that we may affirm a trial court's order relating to a proceedings supplemental on any basis contained in the record. Also, we find Nichols's argument similar to one relating to the sufficiency of the evidence, i.e., Law failed to submit sufficient evidence to support a grant of the claimed exemptions. This court has held that "a party may raise a sufficiency of the evidence claim for the first time in an appellant's brief." *Jamrosz v. Res. Benefits, Inc.,* 839 N.E.2d 746, 757 (Ind.Ct.App.2005), *trans. denied; see also In re P.C.,* 137 Cal.App.4th 279, 40 Cal.Rptr.3d 17, 23 (2006) ("The general principle of forfeiture prohibits parties from addressing on appeal issues not raised at trial. However, the argument that a judgment is not supported by substantial evidence is an 'obvious exception to the rule.'"); *Hoxie Implement Co., Inc. v. Baker,* 65 S.W.3d 140, 153 (Tex.Ct.App. 2001), ("Being an attack on the sufficiency of the evidence, [the appellant] need not have presented the issue below to have preserved it for review.") *review denied. But see New Props., L.L.C. v. Stewart,* 905 So.2d 797, 801–02 (Ala.2004) ("[I]n a nonjury case in which the trial court makes no specific findings of fact, a party must move for a new trial or otherwise properly raise before the trial court the question relating to the sufficiency or weight of the evidence in order to preserve that question for appellate review."). On the other hand, we have also indicated that we "will not affirm on a theory not litigated in the trial court." *Estate of Hann v. Hann,* 614 N.E.2d 973, 978 (Ind.Ct.App.1993). Similarly, we find it difficult to affirm the trial court's deci-

---

limitation referred to by our supreme court in *Zumbrun* or *Foster. See Foster,* 668 N.E.2d at 1242 (recognizing that the constitutional problem is that the statutes "allows debtors to shield an unlimited amount of assets in a life insurance policy or policies"); *Zumbrun,* 626

N.E.2d at 455 (recognizing that the statute at bar was unconstitutional because it "exempted an unlimited amount of intangible assets"). The limitation in subsection (f) eliminates *types* of payments, but puts no limit on the ultimate *amount* subject to exemption.

sion on the basis that Law failed to meet his burden of demonstrating that the exemption was reasonably necessary, as there is no indication in the record that either party or the trial court considered this issue. *Cf. Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 599 (Ind.2001) (recognizing that where issues have not been pled, "we find it difficult to use them here as a basis to sustain the trial court's judgment, as we sometimes do, 'on any grounds apparent in the record' "); *Stafford v. Barnard Lumber Co., Inc.,* 531 N.E.2d 202, 204 (Ind.1988) (recognizing that "an appellate court is bound to affirm the trial court's decision on any theory *before the trial court* which is supported by the evidence" (emphasis added)).

We conclude that in this case, remand to the trial court is the appropriate remedy.[27] This court is not in a position to conclude that the claimed exemption is not reasonably necessary, and remand with instructions that the trial court determine whether any or part of the value of the Pacific life insurance policy is sufficiently related to Law's enjoyment of the necessary comforts of life. *Cf. In re Bannourah,* 201 B.R. at 955–56 (calculating whether exemption was related to necessities of life). Although we recognize that it was Law's burden to come forth with evidence that this exemption was necessary, we do not believe that Nichols was permitted to stand mute regarding this issue at the hearing, and then rely on Law's failure to submit evidence regarding the exemption's necessity on appeal. *Cf. Freas v. Custer,* 201 Ind. 159, 166 N.E. 434, 436 (1929) ("If appellant believed that 'some particular or particulars' pleaded were not probed by sufficient evidence, he should have brought it to the attention of the court, which was not done. Therefore, it is not before the court for review.");[28] *Dep't of Pub. Welfare v. Chapel Pharmacy, Inc.,* 407 N.E.2d 1211, 1212 (Ind.Ct.App.1980) (where a party did not request specific proof of each individual item in an account, that party "cannot sit moot at trial, interposing no objection, and then claim error on appeal").

### Conclusion

We conclude that Nichols's claims were not barred by the statute of limitations or the doctrine of unclean hands and that the trial court did not abuse its discretion in denying the Defendants' request for a jury trial or in entering a default judgment based on the Defendants' discovery violations. We further conclude that the trial court's award of damages was within the scope of the evidence. We also conclude that Nichols's compensation constitutes a "wage" for purposes of the Wage Payment Statute. However, we conclude that it was improper to grant a judgment against

---

**27.** We recognize that Nichols argued at trial that Law could not take advantage of the exemption in Indiana Code section 27–1–12–14 based on the exception in subsection (f) indicating that the debtor may not take advantage of the exemption when the payments were made to defraud the creditor. However, the exemption in section 27–1–12–17.1 does not have this fraud exception. We therefore find it unnecessary to determine whether Law is barred from taking an exemption under section 14 pursuant to subsection (f), as this issue would not be determinative as to wheth-

er Law can ultimately claim an exemption for his policy.

**28.** We recognize that this statement by our supreme court may be inconsistent with the statement by this court in *Jamrosz* that a party may raise sufficiency of the evidence for the first time on appeal. As we are not affirming on the basis of insufficient evidence, we find it unnecessary to address this apparent conflict or determine the validity of the statement in *Jamrosz.*

Prime on Nichols's claim for breach of fiduciary duty, and reverse the trial court's order in this regard. Finally, we remand with instructions that the trial court determine whether any of Law's life insurance policy is exempt from execution.

Affirmed in part, reversed in part, and remanded.

KIRSCH, J., and MATHIAS, J., concur.